RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0245p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MIA BENNETT,

      *Plaintiff-Appellant*,

 *v.*

HURLEY MEDICAL CENTER,

      *Defendant-Appellee*.

No. 23-1162

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:21-cv-10471—Paul D. Borman, District Judge.

Argued: October 19, 2023

Decided and Filed: November 9, 2023

Before: SUTTON, Chief Judge; CLAY and LARSEN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Nicholas B. Roumel, NACHT & ROUMEL, P.C., Ann Arbor, Michigan, for Appellant. Michael W. Edmunds, GAULT DAVISON, PC, Grand Blanc, Michigan, for Appellee. **ON BRIEF:** Nicholas B. Roumel, NACHT & ROUMEL, P.C., Ann Arbor, Michigan, for Appellant. Michael W. Edmunds, GAULT DAVISON, PC, Grand Blanc, Michigan, for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. Plaintiff Mia Bennett appeals the district court's grant of summary judgment in favor of Defendant Hurley Medical Center ("Hurley"). Plaintiff claims that Hurley violated her rights under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12131 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws § 37.1101 *et seq.*, when it stopped permitting her service dog, Pistol, to accompany her while working as a student nurse. For the reasons set forth below, we **AFFIRM** the district court's grant of summary judgment.

## I.  BACKGROUND

### A.  Factual Background

In the fall of 2020, Plaintiff completed a clinical rotation at Hurley as a part of her education as a nursing student at University of Michigan-Flint ("UM-Flint").  She worked on floor 7 East ("7E") for four hours once a week for six weeks.  Although student nurses on the rotation were assigned to two floors, 7E and 9 East ("9E"), Plaintiff could only work on 7E, the floor on which her UM-Flint faculty supervisor worked.

Before beginning the rotation, she requested that her service dog, Pistol, be permitted to accompany her on her rotation, and Hurley agreed.  Pistol assists Plaintiff with her panic disorder, a condition that causes her to have intermittent panic attacks.  For the attacks, she takes the medication Ativan as needed, which takes approximately five to ten minutes to become effective.  Without this medication, Plaintiff's panic attacks can last over an hour, cause her to experience shortness of breath and chest tightness, and even make her feel as if she is "going to die."  Bennett Depo., R. 14-2, Page ID #159–60.

Plaintiff trained Pistol to recognize the symptoms she exhibits just before a panic attack and to alert her to these symptoms so that she can take Ativan before an attack begins.  She is able to take Ativan when the attacks begin, but, as Plaintiff testified in her deposition, when she is "physiologically worked up[,] it takes a little bit longer for [the Ativan] to work."  *Id.* at Page ID #163.  Plaintiff does not recognize the signs of a panic attack as well on her own as she does with Pistol, and, as she attested, by the time that she has recognized her symptoms, she "could be well on [her] way to a full-blown panic attack."  *Id.* at Page ID #162–63.

## 1. Hurley's Service Animal Policy

Hurley's initial decision to allow Pistol in the hospital was informed by its written policy pertaining to service animals, titled "Hurley Medical Center Standard Practice: Service Animals" ("the Policy"). Hurley Service Animal Policy, R. 16-7, Page ID #517–521. It states that "[e]very attempt will be made to not separate or attempt to separate a Handler from her or his Service Animal." *Id.* at Page ID #518. A "Handler" is defined as a "person with a service or therapy animal," and is not explicitly restricted to patients or visitors to the hospital. *Id.*, Page ID #517. However, other provisions of the Policy, including those discussing how Hurley responds to a dog who has caused an allergic reaction, appear to refer to a patient handler. The section of the Policy governing allergies states:

> In the event that a patient or a Facility staff member is allergic to, or has a phobia about animals, the Facility shall further modify its policies, practices and procedures to permit a Service Animal to remain with a patient in an inpatient room by, for example, moving the patient to another comparable room, changing staff schedules, or using other nondiscriminatory methods so that the presence of the Service Animal would not pose a direct threat and would not require a fundamental alteration in the Facility's policies, practices, or procedures. Any patient or staff member with an allergy to animals shall provide verification within a reasonable time frame of request.

*Id.*, Page ID #521.

The Policy provides that service animals will generally be excluded from certain sterile areas, including "where a patient is immunosuppressed or in isolation," such as operating rooms or the post-anesthesia recovery unit. *Id.*, Page ID #520. It further states that, a service animal will be

> generally permitted in inpatient and outpatient areas unless an individualized assessment is made to exclude a Service Animal. This assessment shall be based on reasonable [judgment] that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration and severity of the risk; the probability that a potential injury will actually occur; and whether any reasonable modifications of policies, practices or procedures or the provision of auxiliary aids or services will mitigate the risk.[1]

*Id.*

---

[1]This Policy largely tracks Department of Justice regulations implementing the ADA.

### 2. Pistol Causes Allergic Reactions

On the first day that Plaintiff brought Pistol to the hospital, one staff member and one patient reported experiencing allergic reactions. The staff member, Alexis Neal, obtained medical treatment after she suffered a severe allergic reaction from dog allergies. Neal's nurse manager believed that Neal had not seen Pistol before she suffered an allergic reaction because, when she approached the manager, she asked "is there a dog on the floor because I'm starting to have allergic reactions." Martin Depo., R. 14-4, Page ID #245. Neal left work for the rest of the day on September 9, 2020, and did not return until September 11, requiring the nurse manager for the floor to find a replacement for Neal, a unit clerk. Because the manager could not find another unit clerk to replace Neal on such short notice, she had to assign an assistant nursing manager to Neal's position, which meant that the assistant nursing manager had to primarily sit at the nurses' station and could not be "mobile" on the floor. *Id.* at Page ID #246. The nurse manager stated that this immobility caused a "burden on the unit." *Id.*

On the same day, another nurse reported that a patient had used the call system to ask whether there was a dog on 7E because the patient had begun to have an allergic reaction. Additionally, the nurse manager learned that another nurse, Tanesha Hippolyte, had severe dog allergies. Hippolyte was not working in the hospital the day that Plaintiff brought Pistol, but she was regularly assigned to 7E. However, the manager rescheduled Hippolyte so that she would no longer work on 7E for the duration of the Plaintiff's rotation. Hurley staff informed Plaintiff that there were individuals with dog allergies on 9E as well.

### 3. Hurley Reevaluates the Accommodation

After Hurley became aware that one patient and one employee had allergic reactions to Pistol, Hurley began to reevaluate Plaintiff's ability to have Pistol accompany her at all times in the hospital. When Summer Jenkins, the Hurley staff member charged with ADA compliance, informed Plaintiff that her accommodation would be reevaluated, Plaintiff offered to have Pistol wear a "Shed Defender," a type of body suit that covers dogs and minimizes the spread of allergens while Pistol was in the hospital. Bennett Depo., R. 14-2, Page ID #169. However, in a later email to Jenkins on September 15, 2020, Plaintiff stated that she had "inquired about the

[S]hed [D]efender" but that the company had told her that "they would not fit [Pistol's] breed." Email, R. 14-9, Page ID #417. She told Jenkins that she was "looking for other options, or possibly seeing if [her] mom could alter it to fit" Pistol. *Id.* Plaintiff never informed Hurley whether she had successfully found those "other options."

Just a few hours later, Jenkins emailed Plaintiff back, revoking her ability to have Pistol with her at all times in the hospital. Specifically, Jenkins acknowledged that Pistol had already caused allergic reactions, and, because Hurley had confirmed that individuals with dog allergies were present on both floors 7E and 9E, Hurley could not permit Pistol to accompany Plaintiff on either floor.[2] Jenkins further stated that Hurley had "researched any options that would not pose a direct threat and would not require a fundamental alteration in the hospital's policies, practices, or procedures," and concluded that the reasonable accommodation it could provide moving forward would be to crate Pistol in the hospital and provide Plaintiff with "the opportunity to take necessary breaks" in order to be with Pistol. Email, R. 14-9, Page ID #418. Jenkins stated that the hospital remained "open to continued dialogue on this matter." *Id.* Jenkins stated in her deposition that the Shed Defender remained an available option from Hurley's perspective, but acknowledged that, by Plaintiff's own admission, she had not yet been able to obtain one to fit Pistol. At this point, time was of the essence because Plaintiff needed to appear for her rotation the following day, September 16, 2020.

Jenkins recalled that Plaintiff did not bring Pistol to the hospital with her at all on September 16, 2020. On September 17, 2020, Plaintiff responded to Jenkins' email stating that "[w]hile I appreciate the revised accommodation offer," of the crate, "it will not work for the proper utilization of the service dog." Email, R. 16-12, Page ID #585. Plaintiff did take Jenkins up on her offer of continued dialogue, and they, along with two officials from UM-Flint, met over video conference on September 21, 2020.

This conversation did not alter Hurley's position. On September 22, 2020, Jenkins emailed Plaintiff to confirm that Pistol would only be allowed in the hospital if he was kept in a

---

[2]It is unclear why this email references 9E, as nowhere else does the record indicate that Plaintiff worked on the ninth floor during her rotations, and other hospital staff stated that Plaintiff could not work on 9E because no UM-Flint faculty member would be able to supervise her there.

crate on a separate floor during the day. She again acknowledged that Plaintiff would be permitted to take both scheduled and unscheduled breaks to visit Pistol, but emphasized Hurley's position that having Pistol accompany Plaintiff while working on 7E was "not reasonable" because of the previous allergic reactions he had caused. Email, R. 16-14, Page ID #590. She also indicated that relocating patients and staff members with dog allergies from 7E to another floor would be "unworkable and would directly compromise patient care." *Id*. She concluded by acknowledging that Hurley had "extensive dialogue with medical care providers to assess" Plaintiff's accommodation. *Id.* at Page ID #591. Based on this dialogue and "the objective evidence," Jenkins stated that permitting Pistol to accompany Plaintiff "creates a[n] unreasonably high probability that patient care will be adversely affected." *Id.* In a later, final email, Jenkins advised Plaintiff that Hurley would provide space for a crate for Pistol on the eighth floor. The email further reiterated that Plaintiff would receive regular, scheduled breaks, and that if Plaintiff needed to leave the floor for an unscheduled break, "Hurley [would] make every effort to accommodate" those breaks. Email, R. 16-15, Page ID #593.

Plaintiff finished her rotation at Hurley on 7E without Pistol with her or in a crate and without experiencing a panic attack. In the rest of her time as a nursing student at UM-Flint, Plaintiff completed two rotations at other hospitals with Pistol, and at least one other rotation at Hurley without Pistol in the Pediatric Unit, Pediatric Intensive Care Unit, and the Emergency Department.

Hurley's primary concerns about Pistol were his allergens, specifically that he could cause future allergic reactions in patients and staff on 7E. Because Hurley contended that it could not move Plaintiff from 7E, it would need to move allergic staff members or patients from 7E to avoid more allergic reactions. However, Hurley staff stated that relocating staff and patients would be difficult for the hospital and could compromise patient care. Moving nurses would be difficult because Hurley nurses are union members; their collective bargaining agreement imposes additional requirements when adjusting schedules. And relocating staff more generally would be onerous because the hospital was short-staffed during the COVID-19 pandemic. Additionally, because certain nurses assigned to floors can perform medical care that nurses assigned to other floors cannot, moving certain nurses to a different floor could impact

patient care.  For example, according to Hurley's chief nurse, nurses on 7E play a role in a specific type of kidney dialysis that nurses on 9E cannot perform.  Moving allergic patients from 7E could also be difficult because the hospital was "packed" during COVID-19, and patients would need to be moved to an area of the hospital that could provide the specific care they needed.  Martin Depo., R. 14-4, Page ID #248.  Furthermore, even if Hurley could move allergic patients, it might not know which patients have dog allergies.  Although it asks patients whether they have allergies generally before treating them, it does not specifically ask whether patients are allergic to dogs.

Certain Hurley decision-makers expressed concerns about potential issues other than allergies, such as whether a dog on a floor with immunocompromised or unconscious patients could be dangerous.  The hospital places most of its patients with kidney disease on 7E because it has the capability to provide a certain type of kidney dialysis on that floor, and, as a Hurley staff member stated, many patients with kidney disease are immunocompromised.  One Hurley staff member also worried about a dog who produces allergens being around unconscious patients because these patients may not be able to communicate that they are experiencing an allergic reaction; however, there is a dispute as to whether any patients on 7E were unconscious. One staff member stated in her deposition that 7E did not have any unconscious patients, but another staff member stated that "many of the patients on the floors[3] where Plaintiff was assigned arrive unconscious, and can't be screened for dog allergies."  Bade Affidavit, R. 14-10, Page ID #421.

## B.  Procedural History

On March 1, 2021, Plaintiff filed her complaint in the United States District Court for the Eastern District of Michigan.  Plaintiff seeks monetary damages and equitable relief.[4]  The district court granted summary judgment for Defendant, finding that no reasonable juror could

---

[3]Again, there is no other indication in the record that Plaintiff was assigned to multiple floors; rather, the record indicates that she was only ever assigned to 7E.

[4]Plaintiff alleged in her complaint that, although the fall 2020 semester is over, her request for injunctive relief is not moot because "[t]his dispute is likely to arise again" as Plaintiff will participate in future rotations. Compl., R. 1, Page ID #8.  Neither party has indicated how likely it is that Plaintiff will complete a future rotation at Hurley, although the record reflects that she has completed at least one there since fall 2020.  Additionally, at oral argument, Plaintiff's counsel represented that she was, at that time, still an undergraduate nursing student.

conclude that Hurley failed to provide Plaintiff with a reasonable accommodation because Pistol constituted a direct threat to the health and safety of patients and staff.  The district court also held that Plaintiff had abandoned her intentional discrimination claim by failing to respond to Defendant's arguments in her response to the motion for summary judgment.  The district court further concluded that Hurley did not obstruct the interactive process required by Title II of the ADA because Jenkins' emails with Plaintiff at all times indicated that Hurley remained open to continued conversation as to Plaintiff's accommodation.  Finally, the district court also granted summary judgment for Defendant on Plaintiff's Rehabilitation Act and PWDCRA claims because it agreed with the parties' conclusions that these claims should be resolved consistently with Plaintiff's ADA claims.  Plaintiff's timely appeal followed.

## II.  DISCUSSION

### A.  Standard of Review

This Court reviews a district court's grant of summary judgment *de novo.  Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021).  "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516 (6th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)).  "When evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the party opposing the motion," and "all reasonable inferences must be made in favor of the non-moving party." *Id.* (citations omitted) (cleaned up). "However, 'the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment].'"  *Levine v. DeJoy*, 64 F.4th 789, 796 (6th Cir. 2023) (alteration in original) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008)).  Instead, "'there must be evidence on which the jury could reasonably find for the' non-moving party." *Id.* (quoting *White*, 533 F.3d at 390).

### B.  Analysis

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity." 42 U.S.C. § 12132. Plaintiff also brings claims under Section 504 of the Rehabilitation Act and the Michigan PWDCRA. Generally, this Court interprets claims under Title II of the ADA and the Rehabilitation Act together because the language of the two statutes materially differs in only two ways. *See, e.g.*, *Knox Cnty., Tennessee v. M.Q.*, 62 F.4th 978, 1000 (6th Cir. 2023); *S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008). First, the Rehabilitation Act applies only to federally funded, rather than "public" entities. *S.S.*, 532 F.3d at 452. Defendant does not contest that it meets both classifications. Second, the Rehabilitation Act requires that discrimination occur "solely by reason of" the plaintiff's disability, whereas the ADA requires that it occur "because of" the plaintiff's disability. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315 (6th Cir. 2012) (en banc) (quoting 29 U.S.C. § 794(a) & 42 U.S.C. § 12112(a)). Because Plaintiff has failed in the instant case to meet the less stringent causation standard under the ADA, we analyze her claims under the ADA and the Rehabilitation Act together. *See Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016). The Michigan PWDCRA similarly "substantially mirrors" the ADA, and these claims are "generally analyzed identically." *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (citations omitted); *see also Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012). Neither party disputes that we should analyze the three statutes together. Thus, if Defendant is entitled to summary judgment on the ADA claim, then it is also entitled to summary judgment on the Rehabilitation Act and Michigan PWDCRA claims.

## 1. Intentional Discrimination

### a. Preservation of the Issue for Appeal

Plaintiff challenges the district court's determination that she abandoned her claim of intentional discrimination by failing to raise arguments in support of it in her response to Defendant's motion for summary judgment. When a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited. *See Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 n.1 (6th Cir. 2021) (citing *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013)); *Palma v. Johns*, 27 F.4th 419, 429 n.1 (6th Cir. 2022). To address an argument in the district court, "a litigant must provide some minimal argumentation in favor of it." *United States v. Huntington Nat. Bank*, 574 F.3d 329, 331

(6th Cir. 2009) (citation omitted). "[W]e give de novo review to [the] conclusion that [an] argument was forfeited." *Id.*

The district court erred in concluding that Plaintiff abandoned her intentional discrimination claim. In its motion for summary judgment, Defendant correctly acknowledged that, to succeed, Plaintiff must show that Defendant discriminated against her "because of her disability," rather than because of its concerns about Pistol. *Anderson v. City of Blue Ash*, 798 F.3d 338, 358 (6th Cir. 2015) (quoting *Dillery v. City of Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005), *abrogated on other grounds as recognized by Anderson*, 798 F.3d at 357 n.1). In response, Plaintiff failed to point to sufficient record evidence to show that Hurley barred Pistol from accompanying Plaintiff because of her panic disorder. However, Plaintiff did not wholly fail to make arguments supporting a claim for intentional discrimination. To the contrary, she argued in her response to the motion for summary judgment that Hurley's exclusion of Pistol from 7E effectively excluded her from participation in, and denied her the benefits of, the rotation. She consistently framed her arguments using the prima facie case for intentional discrimination under Title II of the ADA, even if she never directly stated or put forward sufficient evidence that Hurley acted because of her panic disorders. That a party's arguments are ultimately unsuccessful does not mean that they do not exist. Therefore, the district court erred in finding that Plaintiff abandoned her claim of intentional discrimination. But, because Plaintiff presented no evidence to show that Hurley discriminated against her because of her disability, the district court did not err in ultimately granting summary judgment in Defendant's favor.

### b. Analysis

To show causation as part of an intentional discrimination claim under Title II—that discrimination was "because of" a disability—a plaintiff can use either direct or indirect evidence of discrimination. *Gohl*, 836 F.3d at 682 (citation omitted). Because the record contains no direct evidence of discrimination against Plaintiff based on her disability, Plaintiff must meet the requirements of the familiar *McDonnell Douglas* burden shifting framework, which first requires the plaintiff to establish a prima facie case of discrimination. *Id.*; *Anderson*, 798 F.3d at 356 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) & *Turner v.*

*City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006)). "To establish a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability." *Anderson*, 798 F.3d at 357. To show the third prong of the prima facie case, a plaintiff "must present evidence that animus against the protected group was a significant factor in the position taken by the . . . decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *Id.* (quoting *Turner*, 195 F. App'x at 353). If a plaintiff establishes a prima facie case under Title II, the burden shifts to the defendant to proffer a "'legitimate, nondiscriminatory' reason for its actions." *Gohl*, 836 F.3d at 683 (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1179, 1185 (6th Cir. 1996)). If the defendant does so, the burden shifts back to the plaintiff to show that the "proffered reason is merely a pretext for unlawful discrimination." *Id.* (citing *Monette*, 90 F.3d at 1186–87).

Plaintiff asserts that the hospital intentionally discriminated against her when it prevented Pistol from accompanying her on her rotation, but she has not pointed to sufficient evidence in the record to show that Defendant's actions were motivated by Plaintiff's disability. This Court's decision in *Anderson* is instructive. 798 F.3d 338. In it, the Court assessed whether an ordinance that prohibited housing farm animals at a private residence intentionally discriminated against an individual who used a miniature horse as a service animal. *Id.* at 348. Although the record showed that the city passed the ordinance because of the plaintiff's horse and other farm animals on her property, the Court found that this evidence did not show that the city passed the ordinance "because [plaintiff] is *disabled*" but rather that the city passed it because of citizen complaints. *Id.* at 359 (emphasis in original). Similarly, in *Dillery*, the Court found that police who stopped an individual using a wheelchair in the roadway did not do so "because of her disability," but, instead, did so in response to concerns expressed by other citizens who had to "stop or swerve" to miss the plaintiff. 398 F.3d at 568; *see also Hamm v. City of Gahanna, Ohio*, 109 F. App'x 744, 747 (6th Cir. 2004) (finding no intentional discrimination when a decision was based entirely on neighbors' opposition to the project rather than discriminatory animus).

Similarly, here, Plaintiff has not shown that the hospital prevented Pistol from accompanying Plaintiff on her rotations because of Plaintiff's panic disorder. By contrast, the record evidence clearly shows that the decision was motivated by staff and patient complaints of allergic reactions. But these concerns are all related to Pistol, rather than Plaintiff's panic disorder. A Hurley staff member involved in the decision to exclude Pistol even testified that she did not know what specific medical condition Plaintiff had. As in the district court, on appeal, Plaintiff does not argue that the hospital acted out of animus against her disability. Instead, she continues to argue that the separation from Pistol denied her the benefits of the rotation and effectively excluded her from the rotation. But, as this Court's precedent shows, she must show that this purported denial of the benefits of the rotation was because of her disability. Because she has not done so here, she has failed to establish a prima facie case of intentional discrimination, and the district court properly granted summary judgment in Defendant's favor as to Plaintiff's intentional discrimination claim.

## 2. Failure to Accommodate

"Title II does not expressly define 'discrimination' to include a refusal to make a reasonable accommodation." *Madej v. Maiden*, 951 F.3d 364, 372 (6th Cir. 2020) (quoting *Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737, 750 (7th Cir. 2006) (en banc)). Instead, the Department of Justice's ("DOJ") regulations implementing the ADA specify that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). Additionally, this Court has repeatedly stated that failure-to-accommodate claims are cognizable under Title II of the ADA, despite the lack of clear language in the statute. *See, e.g.*, *Knox Cnty.*, 62 F.4th at 1000 ("A plaintiff may allege disability discrimination [under Title II] under two available theories: intentional discrimination and failure to reasonably accommodate."); *Jones v. City of Detroit, Michigan*, 20 F.4th 1117, 1119 (6th Cir. 2021) ("A Title II plaintiff may bring a claim for intentional discrimination or for failure to provide a reasonable accommodation.") (citing *Roell v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017)); *Wilson v. Gregory*, 3 F.4th 844, 859

(6th Cir. 2021) (recognizing a failure-to-accommodate claim under Title II because "Title II imposes affirmative obligations on public entities and does not merely require them to refrain from intentionally discriminating against the disabled") (quoting *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 910 (6th Cir. 2004)); *Roell*, 870 F.3d at 488 ("Two types of claims are cognizable under Title II: claims for intentional discrimination and claims for a reasonable accommodation.") (citation omitted)); *Ability Ctr.*, 385 F.3d at 907 ("[Title II] also requires that public entities make reasonable accommodations for disabled individuals . . ."). Defendant below expressly waived any argument that failure-to-accommodate claims are not cognizable, so we will not examine that issue further.

Title II does not require a plaintiff to receive her "preferred" accommodation, *Knox Cnty.*, 62 F.4th at 1001, but merely a reasonable one that provides "meaningful access" to the public entity, *Ability Ctr.*, 385 F.3d at 907. "[T]he 'determination of what constitutes [a] reasonable [accommodation] is highly fact-specific, requiring case-by-case inquiry.'" *Roell*, 870 F.3d at 489 (quoting *Anderson*, 798 F.3d at 356). To assist in determining what constitutes a reasonable accommodation of a service animal in a healthcare setting, the regulations implementing the ADA and the, albeit scant, relevant case law are instructive.

### a. Reasonable Accommodations for Service Animals

The DOJ has implemented regulations describing how service animals should be accommodated by public entities under the ADA, and the parties largely agree that these regulations provide a basis for assessing whether Defendant reasonably accommodated Plaintiff's requests under the ADA. The district court determined that the DOJ regulations and guidance are entitled to deference. Neither party questions that conclusion on appeal. The specific regulation addressing the accommodation of service animals begins with a general presumption that service animals will be permitted in publicly accessible areas of public entities by stating that a public entity "shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability."[5] 28 C.F.R. § 35.136(a). Specifically, it

---

[5]A service animal is defined as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. § 35.104. In the district court, Defendant contested whether Pistol constituted a service

directs that "[i]ndividuals with disabilities shall be permitted to be accompanied by their service animals in all areas of a public entity's facilities where members of the public, participants in services, programs or activities, or invitees, as relevant, are allowed to go." *Id.* § 35.136(g). The appendix to the regulations specifically states that "a healthcare facility must also permit a person with a disability to be accompanied by a service animal in all areas of the facility in which that person would otherwise be allowed." *Id.* § Pt. 35, App. A. However, it also states that "it is generally appropriate to exclude a service animal from limited-access areas that employ general infection-control measures, such as operating rooms and burn units." *Id.*

Service animals need not be accommodated under every circumstance, and the regulations specify the situations in which a public entity may reasonably exclude a service animal. For example, a public entity may exclude the animal if it is "out of control," or if it is "not housebroken." *Id.* § 35.136(b). The regulations also provide at least two general defenses to accommodations that are applicable to service animals. First, if "the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," of the public entity, it need not grant the accommodation. *Id.* § 35.130(b)(7). Second, if the entity can show that an individual's participation in the activities of the public entity poses a "direct threat to the health or safety of others," the public entity may exclude the individual. *Id.* § 35.139(a). In the context of a service animal, the appendix to the regulations states that this means that, by extension, if an individual's use of a service animal poses a direct threat, it may be excluded under this provision. *Id.* § Pt. 35, App. A.

When determining whether an individual's use of a service animal constitutes a direct threat, the regulations direct public entities to conduct "an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence," to assess the following three factors: (1) "the nature, duration, and severity of the risk;" (2) "the probability that the potential injury will actually occur;" and (3) "whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk." *Id.* § 35.139(b). To an extent, the direct threat analysis

animal under the ADA; however, the district court did not address this argument, and Defendant does not raise it on appeal.

represents a specific application of another general defense in the regulations, which acknowledges that "[a] public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities," provided that these "safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.* § 35.130(h).

Plaintiff also cites guidance from the DOJ interpreting its own service animal regulations under the ADA, which adds examples and clarification to the DOJ's regulations. In relevant parts, the guidance provides an example of how public entities should implement the DOJ's regulation requiring that service animals be permitted in public areas:

> For example, in a hospital it usually would be inappropriate to exclude a service animal from areas such as patient rooms, clinics, cafeterias, or examination rooms. However, it may be appropriate to exclude a service animal from operating rooms or burn units where the animal's presence may compromise a sterile environment.

Dep't of Just., Civil Rights Division, ADA Requirements: Service Animals (July 1, 2011), https://www.ada.gov/service_animals_2010.htm (last updated Feb. 28, 2020). Additionally, this guidance speaks directly to the DOJ's view on how a public entity should handle a dog who spreads allergens:

> Allergies and fear of dogs are not valid reasons for denying access or refusing service to people using service animals. When a person who is allergic to dog dander and a person who uses a service animal must spend time in the same room or facility, for example, in a school classroom or at a homeless shelter, they both should be accommodated by assigning them, if possible, to different locations within the room or different rooms in the facility.

*Id.*

Both the applicable regulations and guidance suggest the following course of action for public entities when admitting service animals: service animals are permitted as a reasonable accommodation unless they are "out of control," "not housebroken," would fundamentally alter the activities of the public entity, or, if, after conducting an individualized assessment of the animal, the public entity concludes that the service animal poses a direct threat. And the appendix to the regulations specifically acknowledges that service animals may be permitted in

hospitals when restricted to the areas accessible by the general public but may be excluded from sterile areas.  DOJ guidance suggests that allergies should not constitute a reason to exclude an animal, but that the public entity should seek to separate the service animal from the individual with allergies, if possible.

To our knowledge, no circuit courts have had occasion to consider how a healthcare provider should reasonably accommodate a service animal under Title II of the ADA.[6]  Case law from other circuits addressing service animals in general supports the parties' view that the regulations create a presumption in favor of admittance of service animals.  *See Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 119 (3d Cir. 2018) (considering regulations under both Title II and Title III of the ADA); *see also Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 179 (3d Cir. 2019) (finding presumption created by similar regulations under Title III); *Johnson v. Gambrinus Co.*, 116 F.3d 1052, 1064 (5th Cir. 1997) (same).

### b. Whether Pistol Posed a "Direct Threat" to the Health and Safety of Patients and Staff

On appeal, Plaintiff challenges the district court's conclusion that Hurley reasonably determined that Pistol posed a "direct threat" to the health and safety of the employees and patients in the hospital, and that the hospital conducted a sufficiently individualized inquiry to make this assessment.  To evaluate whether Pistol posed a direct threat, the regulation sets forth the following factors for an entity to consider:  (1) "the nature, duration, and severity of the risk;" (2) "the probability that the potential injury will actually occur;" and (3) "whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk."  28 C.F.R. § 35.139(b).  Hurley could exclude Pistol if he constituted a legitimate threat to health and safety, but this determination must be "based on actual risks, not

---

[6]The district court and the parties discuss several out-of-circuit district court cases, none of which directly addresses how a healthcare entity without a blanket policy against service animals should provide a reasonable accommodation for a student nurse using a service animal, as opposed to a patient.  *See, e.g.*, *Rose v. Springfield-Greene Cnty. Health Dep't*, 668 F. Supp. 2d 1206 (W.D. Mo. 2009), *aff'd sub nom. Rose v. Cox Health Sys.*, 377 F. App'x 573 (8th Cir. 2010); *Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077 (N.D. Cal. 2013); *Bartell v. Grifols Shared Servs. NA, Inc.*, 618 F. Supp. 3d 275, 284 (M.D.N.C. 2022); *Pool v. Riverside Health Servs., Inc.*, No. 94-1430-PFK, 1995 WL 519129, at *1 (D. Kan. Aug. 25, 1995); *Roe v. Providence Health Sys.-Oregon*, 655 F. Supp. 2d 1164 (D. Or. 2009).

on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.* § 35.130(h).

It is undisputed that Pistol caused two allergic reactions on his first day in the hospital, establishing that Pistol created an actual risk of future allergic reactions in staff members and patients who were allergic to dogs. The serious allergic reaction of the unit clerk, Neal, shows that, in some individuals, this risk could be severe. Moreover, without separating allergic patients and staff from Pistol during Plaintiff's time in the hospital, these allergic reactions were likely to recur. The central question is whether, as a matter of law, Hurley reasonably concluded that the modifications necessary to ameliorate this risk were unreasonable. We believe that it did.

Plaintiff suggests that the hospital could have taken reasonable steps to separate Pistol from allergic patients and staff. First, she contends that Hurley could have moved her to floor 9E, away from the individuals who had allergies on 7E. But this solution would have been unreasonable for two reasons. As a Hurley staff member stated, although both floors 7E and 9E housed the "fundamentals of nursing" rotation, 9E did not have a UM-Flint faculty member to supervise Plaintiff. Accordingly, Plaintiff needed to conduct her rotation on 7E.

More importantly, Jenkins testified that Plaintiff could not have moved to 9E because an individual on that floor had allergies as well, meaning that this change would not have mitigated the risk posed by Pistol. On appeal, Plaintiff attempts to dispute that another individual had allergies on 9E because "Jenkins provided no name or details, and *no one else* mentioned this alleged person on 9." Appellant Br., ECF No. 22, 25 (emphasis in original). Plaintiff supports this purported dispute only with conjecture and cites no record evidence that creates a genuine dispute of material fact. She indicates that 7E's nurse manager "had no information about an allergy on 9," and that, because Jenkins worked in administration, and the manager worked in the medical units, the manager would have more information as to who had allergies in the building. *Id.* However, the 7E manager's statement that she was "not sure" whether there were allergies on 9E does not create a genuine dispute of material fact on this issue, especially because it is highly likely that a manager of floor 7E would not have known the specific allergen issues of staff or patients on an entirely different floor. Martin Depo., R. 16-16, Page ID #617. Plaintiff

also indicates that Defendant's brief in support of its motion for summary judgment only referenced allergies on 7E, rather than 9E. The fact that Defendant's counsel did not specifically describe the allergies referenced on 9E in its brief does not itself contradict the express record evidence that Jenkins believed there to be dog allergies on 9E. Because moving Plaintiff to 9E would not have mitigated Pistol's potential risk of causing an allergic reaction, it would not have constituted a reasonable, or even feasible, accommodation.

Plaintiff also suggests that Hurley could have relocated allergic patients so that they would not come into contact with Pistol. Crucially, Hurley presented evidence that, in the fall of 2020, it did not screen patients for dog allergies. Without requiring it to implement an entirely new allergy screening policy, Hurley would not know which patients would be at risk for an allergic reaction to Pistol. Moreover, the record indicates that Pistol caused an allergic reaction in a patient just from his presence on the floor, meaning that any patient placed on floor 7E with an unknown allergy to dogs could be at risk.

Even if the hospital could determine who had a dog allergy, Hurley presented evidence that moving patients to different floors could be burdensome. The hospital was "packed" during the COVID-19 pandemic, and patients would have needed to be moved to a floor that had staff and services available to treat their specific medical needs. Martin Depo., R. 14-4, Page ID #248. Plaintiff did not present any evidence that contradicted the difficulty Hurley would have moving allergic patients, even if the hospital could identify them, and, thus, the proposed accommodation of moving allergic patients away from Pistol was unreasonable.

Finally, Plaintiff suggests that Hurley could have moved allergic staff away from Pistol. Hurley presented evidence that it was difficult to move staff in the fall of 2020 because of staffing shortages related to the COVID-19 pandemic, and that moving nurses specifically is difficult because staff changes must go through the nurses' bargaining unit. Moreover, Hurley also presented evidence that staff members who provide specific services are needed on certain floors in the hospital because they provide unique care to patients on those floors. Specific to floor 7E, certain nurses play a role in a specialized form of kidney dialysis. Plaintiff correctly identifies that Hurley did reassign Hippolyte, the nurse who had dog allergies but was not at the hospital on September 9. But merely because the hospital was able to move *one* nurse does not

create a genuine dispute of fact as to whether it would have been reasonable to ask it to move *all* nurses who may be allergic and assigned to 7E. Hurley presented evidence of the difficulties it would face moving staff in a crowded hospital experiencing staff shortages from the COVID-19 pandemic, particularly from a floor providing specialized care to patients. Accordingly, requiring it to move staff to another floor under these circumstances would be unreasonable.

In sum, the district court properly concluded that Hurley reasonably decided that Pistol posed a direct threat to the health and safety of patients, and that the accommodations necessary to mitigate the risk of his allergens were not reasonable. Hurley did not exclude Pistol pursuant to a blanket policy; indeed, it initially permitted him to accompany Plaintiff on her rotations. However, once he caused two allergic reactions on just his first day, the hospital reasonably determined that it could not sufficiently protect allergic patients or staff members from the threat he posed. It specifically assessed whether, based on this actual risk, it would be able to move allergic patients or staff members away from the dog. Without knowing which patients are allergic to dogs and considering the significant concerns implicated by shifting patients and staff away from floors in the hospital, as well as the overcrowding of the hospital during this specific period due to the COVID-19 pandemic, Hurley did not fail to provide Plaintiff with a reasonable accommodation.

### c. Whether Hurley Failed to Engage in the Interactive Process

In the employment context, this Court has found that the regulations implementing Title I of the ADA require employers and employees to engage in an "interactive process." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (citing 29 C.F.R. § 1630.2(o)(3)). This process requires the employer "to initiate an informal, interactive process," in order to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* This Court has held this process, only described in the regulations implementing Title I of the ADA, is "mandatory" and requires both parties to "participate in good faith." *Id.* (citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391 (2002)). We have not held that the same interactive process requirement applies to Title II of the ADA but

have suggested in unpublished opinions that it could when, as here, the relationship between the individual and the public entity is similar to that of an employer and employee. *See Marble v. Tennessee*, 767 F. App'x 647, 653 (6th Cir. 2019) (citing *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 n.2 (2d Cir. 2012)); *see also Mbawe v. Ferris State Univ.*, 751 F. App'x 832, 840 (6th Cir. 2018). We need not decide whether Title II requires individuals to participate in an interactive process in this situation because, even if it does, Hurley did not violate this requirement in this case.

To establish that Defendant's failure to engage in the interactive process violated the ADA, Plaintiff "must show that a reasonable accommodation was possible" and could have been identified had Defendant engaged in the interactive process. *Keith v. Cnty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013) (citing *Breitfelder v. Leis,* 151 F. App'x 379, 386 (6th Cir. 2005)); *see also Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014). As the Seventh Circuit has recognized, this is because the interactive process requirement "is a means for identifying a reasonable accommodation rather than an end in itself." *Sansone v. Brennan*, 917 F.3d 975, 980 (7th Cir. 2019) (citing *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1023 (7th Cir. 1997)). In this case, Plaintiff has not identified a reasonable accommodation that would have been possible. Pistol posed a direct threat to the health and safety of staff and patients, and requiring the hospital to move allergic staff and patients to accommodate Pistol would not be reasonable. Moreover, by Plaintiff's own admission to Jenkins, putting Pistol in a Shed Defender was not possible at the time of her rotation because the product was not offered in Pistol's size, and she had not procured an altered garment.

To the extent that the hospital's offer to crate Pistol on a separate floor could constitute a possible reasonable accommodation, this certainly precludes Plaintiff's claim that Hurley failed to participate in the interactive process in good faith. As we have held, "taking the extra step of proposing counter accommodations may be additional evidence of good faith," and when an employer "offers a reasonable counter accommodation, the employee cannot demand a different accommodation." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010) (citation omitted). Moreover, the record evidence shows that the failure to identify a possible reasonable accommodation did not result from Hurley's bad faith or obstruction of the interactive process.

To the contrary, Hurley repeatedly engaged with Plaintiff's suggested accommodations, consulted with medical experts to determine whether they would be feasible, and communicated to Plaintiff its concerns with Pistol's continued presence on floor 7E. Accordingly, assuming that the interactive process requirement applies to Hurley in this case, it did not fail to comply with it.

**CONCLUSION**

For the reasons stated above, the district court's grant of summary judgment to Defendant Hurley Medical Center is **AFFIRMED**.