NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0376n.06

Nos. 23-5654/5663

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Sep 03, 2024
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| ROGER DALE PARKS, Administrator Ad Litem for the estate of Jimmie Ruth Northcutt, LEE JUNE CASTOR, and NINA JOY RICE, (23-5654); AARON HILL and LYNETTA HILL, individually and as next friends and next of kin of decedents, John Hill and James Hill (23-5663), | ) ) ) ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| Plaintiffs-Appellants, | ) ) | OPINION |
| v. | ) ) | |
| KIA MOTORS AMERICA, INC., *et al.*, | ) ) | |
| Defendants-Appellees. | ) | |

Before: CLAY, GIBBONS, and BUSH, Circuit Judges.

CLAY, J., delivered the opinion of the court in which GIBBONS, J., joined. BUSH, J. (pp. 41–46), delivered a separate dissenting opinion.

**CLAY, Circuit Judge.** This appeal comes before us a second time, after we previously reversed and remanded the district court's grant of summary judgment to Defendants. Plaintiffs Roger Dale Parks, Lee June Castor, Nina Joy Rice, Aaron Hill, and Lynetta Hill sued Defendants, including Kia Motors America, Inc., under the Tennessee Products Liability Act ("TPLA"), Tenn. Code § 29-28-101, *et seq.*, after a fatal car accident involving a 2008 Kia Optima. Plaintiffs appeal the district court's exclusion of their expert witnesses and the grant of summary judgment to Defendants. For the reasons set forth below, we **AFFIRM** in part and **REVERSE** in part the district court's exclusion of Plaintiffs' two expert witnesses, **REVERSE** the grant of summary judgment in favor of Defendants, and **REMAND** for proceedings consistent with this opinion.

## I.    BACKGROUND

### A.  Factual Background

This case concerns who is responsible for a car accident on December 31, 2015 that killed three people.  That morning, eighty-three-year old Mary Jean Parks drove her 2008 Kia Optima with her younger sister, Jimmie Northcutt, in the passenger's seat.  The roadway conditions were ordinary, and the posted speed limit on the road was 30 miles per hour.  While driving down the road, Parks' car suddenly accelerated to approximately 92 miles per hour with an engine speed of approximately 4,300 revolutions per minute ("rpm").

Eyewitnesses stated that Parks' vehicle was "flying," and traveled so fast that it shook a car it passed.  Kim Taylor Dep., R. 294-22, Page ID #11603.[1]  Other drivers noticed that Parks' car was "zigging" around other cars on the road in what looked like an attempt to dodge the other cars.  Kim Philpot Dep., R. 294-20, Page ID #11515.

After traveling at this high speed for about a half mile, Parks' car crashed into a Ford minivan stopped at a red light.  Plaintiffs Aaron and Lynetta Hill and their seven-year old twin sons, John and James Hill, were in the minivan.  Eyewitnesses rushed to the crash site.  Parks was "shocked" and "crying," and told one witness that "she couldn't stop the car" and that "[t]he car had a mind of its own."  Tommy Philpot Dep., R. 294-21, Page ID #11560.  When emergency personnel arrived at the scene, Parks told them that something had "happened to [her] car" and that she "could not . . . control it."  Kress Report, R. 286-1, Page ID #6927.

---

[1] All citations are to the record in *Parks, et al. v. Kia Motors America, Inc., et al.,* No. 4:16-cv-118-CEA-CHS.

Parks and the Hill twins were fatally injured by the crash. James Hill died at the scene of the crash, and Parks and John Hill died from their injuries a few days later. The Hill parents and Parks' sister all suffered injuries from the crash.

### B. Procedural History

### 1. Initial District Court Proceedings

This appeal arises from two district court cases, which were consolidated for purposes of discovery. Plaintiffs Aaron and Lynetta Hill are the parents of decedents John and James Hill, and Plaintiffs Roger Dale Parks, Lee June Castor, and Nina Joy Rice are Mary Parks' children and next of kin.[2] Named Defendants in both cases are Kia Motors America, Inc., Kia Motors Corporation, Hyundai-Kia Automotive Group, Hyundai America Technical Center, Inc., Hyundai Motor Company, Hyundai Motor Group, and Hyundai Motor America, Inc.

The lengthy procedural history of these cases began in December 2016, when both groups of Plaintiffs filed complaints alleging violations of the TPLA. Plaintiffs alleged theories of strict liability, negligence, pre- and post-failure to warn, breach of warranty, and vicarious liability pursuant to the apparent manufacturer doctrine.

### a. Unintended Acceleration Terminology

To better understand this litigation's background, we will first define some key terms relating to the various theories of what caused the crash. No party contends that Parks intentionally caused the crash. But the parties vigorously dispute what, in the absence of any intentional pedal application, did cause the crash. Defendants assert that Parks accidentally applied the pedal, causing her car to travel at around 92 miles per hour for approximately half a mile. By contrast,

---

[2] Jimmie Northcutt, Parks' sister, was a Plaintiff at the time of the first appeal, but she has since passed away. Roger Parks continues to represent Northcutt's interest in this action.

Plaintiffs claim that the 2008 Kia Optima malfunctioned on the day of the accident, leading to the sudden and unintended acceleration. Throughout the litigation, they have proffered multiple theories as to how the car might have malfunctioned, and many have centered on a malfunction in the cruise control system that led to unintended acceleration. One prominent theory hypothesized that the cruise control experienced electromagnetic interference ("EMI") on the day of the accident, causing the car to accelerate.

Vehicle engines operate in part by receiving air, and the car's throttle regulates how much air is fed to the engine, controlling the engine's power. In a typical mechanical engine control system, a driver's input—pressing the accelerator pedal—would send a command to the throttle through a cable or other mechanical mechanism, and the engine speed and torque would be controlled through this mechanical input. Most cars manufactured today use an electronic system to control the engine. In an electronic throttle control ("ETC") system, pressing the accelerator pedal sends a signal to the electronic sensors contained in the car's central computer, which we will refer to as the engine control module ("ECM").[3] The ECM then signals to the throttle how much air to supply to the engine. A wide-open throttle means that the engine is operating at full power.

Aside from the accelerator pedal, a driver can also accelerate a car using the cruise control system. A driver can enable the 2008 Kia Optima's cruise control system through buttons on the steering wheel. These buttons are connected to a clock spring, a coiled ribbon cable inside the steering wheel column. The clock spring contains the wires controlling the cruise control, as well

---

[3] At various points, the record refers to this central computer as the engine control unit ("ECU"), the powertrain control unit ("PCU"), or the electronic engine controller ("EEC").

as other buttons on the steering wheel, such as the radio controls. In the 2008 Kia Optima, the signal from the cruise control to the car's central computer runs through a single signal wire.

Two of Plaintiffs' experts theorized that ETCs are susceptible to EMI, which can lead to unintended acceleration. The basic theory proffered by these experts is that EMI or "cross-talk" between wires in close proximity to each other can cause unintended acceleration by activating the cruise control system.

### b. Expert Testimony

Much of the previous and current appeals concern the exclusion of expert testimony by two of Plaintiffs' experts, Steven Loudon and Tyler Kress. But both of the district court's decisions relating to the exclusion of Loudon and Kress depend partly on the testimony of Plaintiffs' other experts, Samuel Sero and Byron Bloch. Generally, Sero outlined how EMI can cause unintended acceleration.[4] Bloch concluded that EMI caused Parks' unintended acceleration, and specifically highlighted his belief that the clock spring in the 2008 Kia Optima was more susceptible to cross-talk due to its design.[5]

Before the first appeal, the district court excluded both Sero's and Bloch's testimony as unreliable because it found that the EMI theory they offered was not scientifically sound.

---

[4] In summary, he explained that the use of computers to control cars' electronic throttle makes the throttle susceptible to EMI and, therefore, susceptible to unintended acceleration via the unintended activation of cruise control. Sero concluded that Park's 2008 Kia was defective in that the cruise control could be unintentionally activated through EMI. He further concluded that, even if Parks had pressed the brakes, the car would have ignored this input because its internal computer had not registered that it was in cruise control mode.

[5] Specifically, he concluded that the clock spring in Parks' 2008 Kia was poorly designed when compared to a similar Chrysler clock spring and that this design caused more repetitive interactions between the wires in the clock spring, making it more susceptible to cross-talk. He further concluded that the clock spring in the 2008 Kia caused this cross-talk on the day of the accident, which then caused an erratic voltage spike in the cruise control system that, in turn, caused the throttle to open fully.

The district court denied motions to exclude Plaintiffs' other experts, Loudon and Kress, as moot because it found that neither Loudon nor Kress offered a theory of a specific defect that could have caused the accident, a key element of Plaintiffs' TPLA claims. The district court instead believed that Plaintiffs proffered Sero's and Bloch's EMI theory to show how the 2008 Kia Optima had been defective, and that Loudon and Kress merely offered circumstantial evidence that the specific defect identified by Sero and Bloch caused the accident on December 31, 2015.

Defendants then moved for summary judgment, arguing that Plaintiffs lacked reliable expert testimony to show that a specific defect in Parks' car proximately caused the accident. The district court agreed and granted summary judgment for Defendants.

## 2. First Appeal

In their first appeal to this Court, Plaintiffs appealed the district court's grant of summary judgment to Defendants and the exclusion of Loudon's and Kress' testimony. They did not appeal the exclusion of Sero's and Bloch's testimony. The panel majority agreed that the district court erred in excluding the testimony of Loudon and Kress as moot and that Loudon had proffered evidence of a specific defect in the 2008 Kia Optima. *See Hill v. Kia Motors Am., Inc.*, No. 20-5690, 2022 WL 557823, at *5 (6th Cir. Feb. 24, 2022) [hereinafter *Kia I*]; *id.* at *18–19 (Gibbons, J., concurring). The previous opinion, however, did not address whether Loudon and Kress produced qualified and reliable expert opinions. It also produced no consensus on whether, considering the evidence, summary judgment was appropriate. The lead opinion found that Plaintiffs had created a genuine dispute of material fact sufficient to proceed to trial, whereas the concurring opinion specified that the district court should consider the merits of the summary judgment motion again after ruling on the motions to exclude Loudon's and Kress' testimony. *Id.*

at *6; *id.* at *18–19 (Gibbons, J., concurring). Accordingly, the case was remanded back to the district court to assess the record with Loudon's and Kress's testimony included.

### 3. District Court's Actions on Remand

On remand, the district court considered anew the motions to exclude Loudon and Kress and Defendants' summary judgment motion. It granted in part and denied in part the motions to exclude the testimony of Loudon and Kress. Analyzing the factors laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and Rule 702 of the Federal Rules of Evidence, it found that much of Loudon's opinion was based on unreliable methodology and excluded portions of his testimony on this basis. 509 U.S. 579, 593–94 (1993). It excluded portions of Kress' testimony because it found that Kress was not qualified to testify about certain issues and that some of his opinions were either unreliable or would not assist the trier of fact.

The district court then granted summary judgment to Defendants. Once again, the district court took issue with Plaintiffs' proof of a specific defect in Parks' 2008 Kia Optima, and particularly took issue with the admissible expert testimony that Plaintiffs had proffered to prove such a defect. It characterized Sero's and Bloch's role in the litigation as "to describe how cruise control induced unintended acceleration is possible"—*i.e.*, through their EMI theory. Order, R. 340, Page ID #13283. By contrast, it described Loudon's testimony as offering circumstantial evidence about how this particular cruise control malfunction could have happened on the day of the crash. However, because Loudon, in the district court's view, did not explain how the cruise control system could cause unintended acceleration, his testimony alone—that is, without the foundational testimony of Sero and Bloch—could not show a specific defect. Because Plaintiffs could not make the required *prima facie* case under the TPLA without proof of a specific defect or unreasonably dangerous condition that caused the accident, the district court granted summary

judgment to Defendants. Plaintiffs timely appealed the district court's partial exclusion of Loudon's and Kress's testimony and the grant of summary judgment to Defendants.

## II. DISCUSSION

### A. Scope of the Mandate

Plaintiffs first argue that the district court's actions on remand violated our mandate from *Kia I*. We review the scope and interpretation of our mandate *de novo*. *Black v. Carpenter*, 866 F.3d 734, 740 (6th Cir. 2017). "[U]pon remand of a case for further proceedings after a decision by the appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal. The trial court must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 549 (6th Cir. 2004) (alteration in original) (quoting *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994)). Plaintiffs argue that, on remand, the district court should not have ruled on the motions to exclude Loudon and Kress or the motion for summary judgment. Instead, Plaintiffs contend that because *Kia I*'s lead opinion found that summary judgment was improper on the merits, the case should have been set for trial on remand. Plaintiffs argue in essence that *Kia I*'s lead opinion alone represents the mandate of *Kia I*.

When presented with separate opinions, we have previously parsed the areas of agreement between two panel members to determine the scope of the mandate. *See United States v. Township of Brighton,* 282 F.3d 915, 917–19 (6th Cir. 2002) (per curiam). As a matter of first principles, this approach is sensible: an opinion must receive two votes from panel members to become a majority. Thus, when there are three opinions, and not all judges agree on the correct path forward,

the areas of agreement between two judges on the panel constitute the panel's holding.[6] Based on this understanding, *Kia I*'s lead opinion cannot constitute the mandate because not every position expressed in the lead opinion gained the assent of two or more judges.

Instead, in *Kia I*, two judges agreed that the district court abused its discretion in denying as moot the motions to exclude the testimony of Loudon and Kress. *Kia I*, 2022 WL 557823, at *5; *id.* at *18–19 (Gibbons, J., concurring). And two judges also agreed that this was because Loudon at least offered a specific defect theory independent of Sero's and Bloch's EMI theory. *Id.* at *5 (finding that both Loudon and Kress offered a specific defect theory, and that both offered circumstantial evidence of the source and cause of the accident); *id.* at *18–19 (Gibbons, J., concurring) ("[P]laintiffs used Loudon's testimony to establish a specific defect—the use of a single wire in the cruise control system."). Two judges also agreed that the grant of summary judgment should be reversed or vacated, albeit for different reasons. The lead opinion concluded that Plaintiffs had established a genuine dispute of material fact, precluding summary judgment on the merits. *Id.* at *6. By contrast, the concurring opinion stated that summary judgment was improper because it rested on the erroneous exclusion of Loudon's and Kress' testimony. *Id.* at *18–19 (Gibbons, J., concurring)

On remand, then, two judges agreed that the district court: (1) could not deny the motions to exclude Loudon's and Kress' testimony as moot and (2) was required to vacate the previous grant of summary judgment to Defendants based on the erroneous assumption that Loudon or

---

[6] Both parties agree that the district court employed the wrong legal test to interpret *Kia I*'s mandate. Specifically, the district court looked to *Marks v. United States*, which governs how lower courts should interpret the precedential impact of fractured Supreme Court decisions, not decisions from the Courts of Appeals. 430 U.S. 188, 193 (1977). *Marks* directs lower courts to interpret the holding of the Court as "that position taken by those Members who concurred in the judgments on the narrowest grounds." *Id.* (citation omitted). But *Marks* does not provide the correct test to determine the mandate of a fractured Court of Appeals decision.

Kress should be excluded as experts because neither proffered a theory of a specific defect. After carrying out these two tasks, the district court was still left with unresolved motions to exclude Loudon and Kress on the merits, and, after properly considering these motions to exclude, an unresolved motion for summary judgment. The district court therefore did not violate the mandate by considering these motions on the merits.

Even still, in evaluating the merits of these motions, the district court did fail to follow the remand instructions of this Court. Two judges agreed that Loudon proffered a specific theory of defect—namely that the use of a single wire to connect all cruise control signals constituted an unacceptable level of risk in the 2008 Kia Optima. *Id.* at \*5; *id.* at \*18–19 (Gibbons, J., concurring). The district court disregarded this agreement by the panel majority when ruling on the merits of the motions before it on remand. Because this impacts the substantive ruling of this Court in this appeal, it will be discussed more thoroughly below.

### B. Exclusion of Expert Testimony

#### 1. Standard of Review

We review a district court's exclusion of expert testimony for an abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. LaVictor*, 848 F.3d 428, 440 (6th Cir. 2017) (citation omitted). We may only reverse if we are left with "a definite and firm conviction that the trial court committed a clear error of judgment." *Tahfs v. Proctor*, 316 F.3d 584, 593 (6th Cir. 2003) (citation omitted).

## 2. Analysis

Plaintiffs argue that the district court erred in excluding portions of Loudon's and Kress' expert testimony. Rule 702 of the Federal Rules of Evidence provides the standards for admitting expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 assigns a district court judge a "gatekeeping role" in "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. This gatekeeping role requires the district court to balance the liberal standard for relevant, admissible evidence with "the need to exclude misleading 'junk science.'" *LaVictor*, 848 F.3d at 441 (citation omitted).

An expert may testify if he is (1) qualified, (2) the testimony is relevant, and (3) the testimony is scientifically reliable. *Id.* Without setting forth a "definitive checklist," the Supreme Court in *Daubert* identified certain factors to assist district judges in assessing whether an expert's testimony is scientifically reliable:

> (1) whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*United States v. Semrau*, 693 F.3d 510, 520 (6th Cir. 2012) (citation omitted).

Ultimately, when reviewing whether a proposed expert is reliable, a district court's primary role is "to determine whether the principles and methodology underlying the testimony itself are valid." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citation omitted). "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. An expert's opinion cannot be based on mere speculation. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000). In particular, an "expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions." *Id.* If an expert does assume facts, these facts must be otherwise in the record. *Id.* Nevertheless, a mere weakness in an expert's factual basis, rather than an absence of factual basis, relates to the evidence's weight rather than admissibility. *Id.*

The district court overstepped the bounds of what *Daubert* and Rule 702 require when it excluded portions of Loudon's and Kress' testimony. A district court acting as the gatekeeper should only exclude evidence that is truly unreliable and should leave mere weaknesses in an expert's testimony to cross-examination. By excluding parts of Loudon's and Kress' testimony that were reliable and had sufficient factual support in the record, the district court exceeded its gatekeeping role.

### a. Loudon's Report and Potential Testimony

Plaintiffs' expert Steven Loudon is an expert in vehicle control systems. His primary report offered opinions in three different areas: the cruise control system in Parks' car, Kia's design engineering process, and a brake override system. He also submitted a rebuttal report that evaluated the accelerator pedal from Parks' car after the accident, and concluded that, based on a half-inch gap between the pedal arm and mount to the car, Parks was likely not depressing the

pedal at the time of the accident.  Defendants moved to exclude all of Loudon's testimony, and the district court granted in part and denied in part this motion.

### i.    Cruise Control Opinions

First, Loudon offered opinions on the 2008 Kia Optima's cruise control system and how it could have led to the December 2015 crash.  Using data on the 2008 Kia Optima collected from an online source, Loudon highlighted that all signaling from the cruise control system ran through a single wire in the clock spring.  He concluded that the use of this single wire "represent[ed] a single point of failure for a major design element of a vehicle safety system" because redundancies are crucial in vehicle design to ensure that if one piece of hardware or software fails, the entire vehicle does not become unsafe.  Loudon Report, R. 288-1, Page ID #7016.  He concluded that this single signal wire design also hindered the development of sound diagnostic tools that could distinguish a legitimate press of the cruise control button from a failure in the cruise control system.

He also noted that the error code denoting an issue with the cruise control system[7] had appeared six times in a report of the historical diagnostic codes in Parks' vehicle.  Loudon concluded that had Kia "designed its cruise control switch with redundant signals"—*i.e.*, without using a single wire creating a single point of failure—then "more robust and timely diagnostics could have been developed that would have mitigated failures which result in unintended acceleration like the accident that occurred with [Parks'] 2008 Kia Optima." *Id.* at Page ID #7020–21.

Loudon also conducted a series of tests on an "exemplar" vehicle, consisting of a 2008 Kia Optima replicating Parks' vehicle.  He accelerated the exemplar vehicle up to 92 miles per hour—

---

[7] This code appears when the cruise control switch is "stuck" for more than one minute. Loudon Report, R. 288-1, Page ID #7018.

the speed displayed on Parks' speedometer after the crash—using both cruise control and manual acceleration. When Loudon accelerated the exemplar vehicle using the cruise control, the car had an engine speed of between 4000 and 4300 rpms, mimicking the 4300 rpms engine speed of Parks' car just after the crash. By contrast, when he accelerated the car manually, the car's engine speeds were generally close to 6000 rpms. From these tests, Loudon concluded that Parks' accident was likely caused by cruise control acceleration.

The district court impermissibly excluded much of this testimony as unreliable. First, "to the extent Loudon [sought] to testify that no other scenario could explain the engine signature other than cruise control-induced acceleration," the district court excluded this opinion as unreliable. Order, R. 340, Page ID #13250. This was an abuse of discretion because it mischaracterizes Loudon's proposed testimony. Rather than making such a definitive statement, Loudon only stated in his report that "this accident was *much more likely* caused by the cruise control system" than pedal misapplication. Loudon Report, R. 288-1, Page ID #7030 (emphasis added). Nor did he make such a definitive statement in his deposition.

Moreover, even if Loudon did testify at trial that the cruise control must have caused Parks' accident, this would be admissible under Rule 702 or *Daubert*. In holding otherwise, the district court faulted Loudon for not having excluded alternative causes for the acceleration of Parks' car other than cruise control. But we have long held that "[i]n order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury." *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000). Instead, "[t]he fact that several possible causes might remain uneliminated only goes to the accuracy of the conclusion, not to the soundness of the methodology." *Id.* (citation omitted) (cleaned up).

In excluding this testimony, the district court's error stemmed from its reliance on cases discussing the reliability of differential diagnosis opinions—testimony from medical experts that attempts to determine the root cause of a specific disorder in a patient. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010). When evaluating the reliability of a differential diagnosis opinion, we look to whether the expert "reliably rule[d] in the possible causes" of the disorder and "reliably rule[d] out the rejected causes." *Id.* But this test addresses whether medical experts have used a reliable *methodology* to reach a differential diagnosis, not whether their causation conclusions are sound. The process of ruling in and ruling out certain causes is inherent to the differential diagnosis opinion. *See id.* ("A differential diagnosis seeks to identify the disease causing a patient's symptoms by ruling in all possible diseases and ruling out alternative diseases until (if all goes well) one arrives at the most likely cause."). This analysis cannot be rigidly applied to all expert testimony addressing causation; indeed, to do so contradicts our earlier holding that the failure to rule out alternative causes goes to the weight of the expert's testimony, not its admissibility. *See Jahn*, 233 F.3d at 390.

Thus, to the extent that Loudon would seek to testify at trial that the cause of Parks' accident was cruise-control induced acceleration, *Daubert* and Rule 702 would not prohibit it. Defendants would have the opportunity to discredit this conclusion on cross-examination; however, because Loudon based his testimony on admissible facts in the record and the results of his own testing, the district court abused its discretion in excluding this conclusion as inadmissible.

The district court further excluded Loudon's conclusion that "an errant signal from the cruise control system in Ms. Parks' vehicle caused unintended acceleration on the day of the crash," as unreliable. Order, R. 340, Page ID #13250. It found this statement conclusory because Loudon had not presented an EMI or cross-talk theory that explained how errant signals could

have caused a cruise control malfunction. Instead, the district court summarized Loudon's report as addressing "mitigation of potential risks and failures," rather than describing "what those risks and failures might be." *Id.* at Page ID #13251. Moreover, the district court noted that Loudon's tests did not attempt to simulate any EMI or cross-talk in the cruise control system.

The district court also went too far in excluding this testimony. Loudon's theory that an errant signal caused cruise control malfunction on the day of the accident was supported by (1) his tests that showed the vehicle's engine speeds were more consistent with cruise control acceleration; (2) his opinion that the single signal wire connecting the cruise control system to the clock spring constituted an unacceptable design choice because it created a single point of failure in the vehicle; and (3) his examination of the previous error codes that Parks' vehicle had generated indicating an issue with the cruise control system. From his belief that the single signal wire created an unacceptable risk of malfunction in the cruise control system, he concluded, based on his tests on the exemplar vehicle and the previous error codes in the vehicle, that this risk of malfunction materialized on the date of the accident. He did not need to present a comprehensive EMI or cross-talk theory to make this opinion reliable. Ultimately, Defendants may successfully convince the trier of fact that Loudon's factual basis for this conclusion rests on a shaky foundation; however, he has based this opinion on his own tests and available record evidence. This makes it admissible. *McLean*, 224 F.3d at 801; *see also Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

Finally, the district court appeared to permit some of Loudon's proposed testimony about the cruise control system; however, it conditioned the admission of Loudon's testimony about the single signal wire defect and his testing on exemplar vehicles on Plaintiffs' ability to show a

specific defect in the cruise control system. This is because the district court believed that, without a theory showing exactly how the cruise control system malfunctioned on the date of the accident, Loudon's single signal wire theory and his exemplar vehicle testing only provided circumstantial evidence of the cause of the crash, and would be irrelevant without a further explanation of the specific defect in the cruise control system. This effective exclusion of portions of Loudon's testimony was an abuse of discretion because it directly contradicted this Court's prior mandate. Two judges in *Kia I* concluded that Loudon's single signal wire theory *was* the specific defect identified by Loudon. 2022 WL 557823, at *5; *id.* at *18–19 (Gibbons, J., concurring). The district court erred by disregarding this conclusion, and by substituting its own version of what Plaintiffs' theory of a specific defect should be. In doing so, the district court impermissibly constricted the proof that Plaintiffs could mount to show a specific defect in Parks' vehicle.

### ii. Design Engineering Process Opinions

Loudon then examined Kia's design engineering process. Across the automotive industry, engineers use the Design Failure Modes and Effect Analysis ("FMEA") as a standard safety review process for vehicles. This process evaluates potential failures in the vehicle and is particularly used to identify and mitigate "potential single points of failure." Loudon Report, R. 288-1, Page ID #7032. A FMEA can be conducted on specific components or entire systems. Loudon contended that he could only independently find record of a FMEA that covered the 2008 Kia Optima's emissions-related components. He further cited to deposition testimony indicating that although another company had conducted a FMEA for the ECM—the electronic computer that controls the throttle and which can be susceptible to cross-talk under the EMI theory—Kia's corporate designee had never seen this FMEA. From this information, Loudon hypothesized that Kia never conducted a system level FMEA on the entire engine management system. Had Kia

conducted this test, Loudon concluded that "it would have come to the conclusion that a single signal wire for cruise control through [] clock spring coils had an unacceptable level of risk." *Id.* at Page ID #7033.

The district court excluded the entirety of Loudon's opinion that Kia should have conducted a FMEA on the engine management system and that this FMEA would have revealed that a single wire design created an unacceptably risky single point of failure. First, the district court held that Plaintiffs had forfeited their arguments on this issue by not responding to it in opposition to Defendants' motion to exclude Loudon's testimony.[8] The district court then concluded that Loudon's opinion was speculative and lacked a factual foundation, making it unreliable. Specifically, the district court highlighted that Loudon did not conduct a FMEA himself and, therefore, did not include in his report what types of malfunctions could result from the single wire design that Loudon claimed a FMEA would reveal.

The district court erred in concluding that Plaintiffs had forfeited any arguments about Loudon's FMEA opinions. Defendants argued that Loudon's FMEA opinions were irrelevant because Loudon had "no evidence that a[] FMEA would have found any problem that actually manifested itself on the day of Mrs. Parks' crash." Mot. to Exclude, R. 288, Page ID #7002. Plaintiffs responded largely by summarizing Loudon's opinion, but explicitly noted his conclusion that Kia's failure to conduct a FMEA was negligent. The district court found that this constituted forfeiture because Plaintiffs did not meaningfully respond to Defendants' relevancy arguments,

---

[8] Although the district court used the word "waived," its characterization of Plaintiffs' actions describes forfeiture, not waiver. Order, R. 340, Page ID #13255. Waiver is the intentional relinquishment of a known right, whereas forfeiture is the failure to make a timely assertion of a right. *See Hamer v. Neighborhood Hous. Servs. of Chicago*, 583 U.S. 17, 20 n. 1 (2017). When a party merely fails to respond to arguments in briefing below, those arguments are forfeited, not waived. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023).

but merely regurgitated Loudon's opinions. To be sure, Plaintiffs could have more comprehensively responded to Defendants' arguments. But they did articulate, by discussing Loudon's conclusions, their theory of why his testimony was relevant to whether Kia negligently manufactured the 2008 Kia Optima. This alone does not constitute forfeiture. *Cf. Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023) ("That a party's arguments are ultimately unsuccessful does not mean that they do not exist.").

The district court also erred in finding Loudon's FMEA opinions unreliable. By finding Loudon's opinion unreliable because he did not conduct a FMEA himself, the district court misconstrued the opinion that Loudon actually proffered. Loudon claimed that the FMEA would reveal an unreasonably dangerous risk in the car—the single wire representing a single point of failure—not any malfunctions themselves. Loudon did not need to conduct a FMEA of his own to assess what it would reveal because he already knew that the 2008 Kia Optima contained, in his view, an unacceptable risk in the form of this single point of failure. Loudon's FMEA opinion was therefore relevant to the issue of whether Kia manufactured its vehicle with an unreasonably dangerous condition, not causation. In this context, it was reliable.

Crucially, Loudon's opinion about the FMEA testing does not neatly resemble his other scientific opinions. In contrast to his tested hypotheses about causation, his FMEA opinion is "technical or other specialized knowledge" to which the *Daubert* reliability factors do not readily apply. *See Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007) (citations omitted). Thus, beyond misunderstanding why Loudon proffered his FMEA opinion, the district court held the testimony to an unnecessarily high standard because Loudon did not need to conduct tests to rely on his specialized knowledge about the automobile industry. Instead, his testimony was reliable because Loudon based it on automobile industry standards that specified

that car companies generally conduct FMEAs, as well as his own personal, specialized knowledge that these FMEAs are intended to reduce risks.  The district court thus erred by excluding this testimony.

### iii.    Brake Override System Opinions

Finally, Loudon explained the benefits of implementing a brake override system, which he claimed Parks' 2008 Kia Optima did not have.[9]  As described by Loudon, a brake override system will stop a car by overriding "whatever is causing the throttle to open and will close the throttle."[10] Loudon Report, R. 288-1, Page ID #7034.  He pointed to deposition testimony from Kia's corporate designee stating that Kia's version of software brake override technology, "Smart Pedal," could have been retroactively installed in Parks' vehicle.  *Id.* at Page ID #7035.  Loudon also conducted a series of tests to demonstrate the benefits of brake override technology.  In one test, he accelerated a vehicle to 92 miles per hour using manual acceleration to create a wide-open throttle, and then braked, allowing the throttle to return to idle.  When the throttle was in an idle position, very little brake force—about five pounds of force—was required to stop the vehicle.  In the second test, he accelerated again using a wide-open throttle, but did not travel as fast as 92 miles per hour.  While keeping his foot on the accelerator pedal and maintaining a wide-open

---

[9] It is unclear whether the 2008 Kia Optima had a brake override system.  In the district court, Defendants attempted to claim that Parks' vehicle was equipped with a brake override system, at least when the driver operated the cruise control system—*i.e.,* when the cruise control system was activated, pressing the brakes would decelerate the car.  By contrast, Defendants' own expert, James Walker, stated in his report that the 2008 Kia Optima was not equipped with a brake override system that would stop the car in the event of pedal misapplication.

[10] Defendants' expert James Walker asserts that brake override systems work only when the accelerator pedal and the brake pedal are pressed down at the same time.  Thus, although Loudon describes the brake override systems as more generally applying whenever the throttle is open, it is not clear that they would, in fact, close the throttle if the driver was not also pressing the accelerator.  That is, it is not clear that a brake override system would stop a car that was accelerating unintentionally due to something other than pedal misapplication.

throttle, he created a "worst case" scenario by pumping the brakes as he tried to stop. *Id.* at Page ID #7036–37. In this scenario, the vehicle never came to a complete stop even though Loudon used much more brake force—approximately 50 pounds.

Loudon concluded from these facts that Kia had the ability to implement a software brake override system as early as 2012. He claimed that such a system would have mitigated a wide variety of unintended acceleration incidents, including those caused by electronic throttle control malfunctions and, more specifically, those caused by cruise control malfunctions. He finished by concluding that had Kia retroactively installed this software into Parks' car, "this accident would never have happened." *Id.* at Page ID #7037.

The district court permitted Loudon to testify as to the results of his tests and his opinions about what a properly designed brake override system would constitute. However, it prohibited Loudon from testifying that Parks' accident would not have occurred had Kia installed a software-based brake override system. The district court again faulted Loudon for failing to test his theory. Specifically, it found that because Loudon had not tested a car using Kia's Smart Pedal technology, he could not say that this technology would have prevented the accident. The district court further faulted Loudon for not explaining how the Smart Pedal technology differed from the brakes in Parks' vehicle. Finally, because it was disputed whether Parks pressed the brakes before the accident, the district court concluded that Loudon's opinion that a brake override system would have prevented the crash was unreliable.

Again, the district court held Loudon's testimony to an impermissibly high standard by labeling his opinion as unreliable because he had not conducted tests on a Kia equipped with Smart Pedal technology. Loudon did run tests on a vehicle that clearly did not have this technology—as evidenced by the fact that the car did not stop when Loudon pressed the brakes with the throttle

wide-open. From the results of these tests, he concluded that it would be extremely difficult for a driver to stop a car with a wide-open throttle by braking in a car without brake override technology. The tests showed the "benefits" of a brake override system, and, conversely, the detriments of driving a car without one. *Id.* at Page ID #7035. Merely because Loudon drew a negative inference from this test does not make it inherently unreliable with respect to the basic conclusion that brake override technology makes it easier to stop a vehicle.

The district court also took issue with Loudon's efforts to tie the results of his testing to the instant accident. First, the district court noted that it is a disputed fact whether Parks pressed the brakes. But merely because an expert bases a conclusion on a disputed fact does not render the conclusion unreliable; instead, "[a]n expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." *McLean*, 224 F.3d at 801. Plaintiffs have supported the theory that Parks had been pressing the brakes at the time of the crash with circumstantial evidence from Kress' report and eyewitness testimony, which suffices. *Id.*

Finally, the district court took issue with Loudon's failure to compare the Smart Pedal system to the brakes on Parks' car. But Loudon never stated that the Smart Pedal system itself would have prevented the accident; instead, he stated only that a general brake override system would have prevented the accident. Smart Pedal was merely an example of the brake override system that Kia could have installed. Loudon thus reliably concluded that a properly operating brake override system could have prevented the crash, based on: (1) his own tests, which showed that braking against a wide-open throttle without a brake override system is difficult if not impossible; (2) the fact that Parks pressed the brakes before the crash; and (3) the fact that Parks' car did not have a brake override system installed. Although some of these facts are disputed,

this goes to the weight of Loudon's testimony, not its admissibility. As such, the district court erred in prohibiting this conclusion.

### iv.  Loudon's Rebuttal Report and Pedal Position Opinions

Loudon prepared a rebuttal report addressing Defendants' expert James Walker's opinion of the position of the accelerator pedal in Parks' car after the accident. By conducting a post-crash 3D modeling of the pedal, Walker concluded that Parks had been depressing the accelerator pedal at the time of the crash. Loudon disagreed. Looking at an exemplar vehicle, he highlighted a half-inch gap between the accelerator pedal arm and the base when the pedal is in an idle position, and no gap when the pedal is depressed. Loudon noted that a photo taken of Parks' accelerator pedal showed a half-inch gap between the pedal arm and base. Based on this gap and a sensor reading indicating an idle pedal at the time of the crash, Loudon concluded that Parks had not been depressing the accelerator pedal at the time of the crash.

The district court excluded Loudon's entire rebuttal report addressing Parks' accelerator pedal because it found that Plaintiffs had waived their arguments in response to Defendants' motion to exclude Loudon's rebuttal report and because it found Loudon's opinion unreliable. Plaintiffs did not waive their opposition to the exclusion of Loudon's rebuttal report because there is no indication that they intentionally relinquished a known right. *Hamer v. Neighborhood Hous. Servs. of Chicago*, 583 U.S. 17, 20 n. 1 (2017). Instead, Plaintiffs mistakenly believed that Defendants did not challenge Loudon's rebuttal report's conclusions about the pedal position, and, therefore, did not substantively argue for the rebuttal report's inclusion. We also do not find that this mistake forfeited the issue because Plaintiffs failed to raise arguments in the district court. Despite its finding of waiver, the district court assessed Defendants' challenge to Loudon's rebuttal reports on the merits, and both parties have argued the merits of this ruling in their appellate

briefing. Thus, considering the issue on the merits will cause no injustice to the parties, who have fully argued and addressed the merits of this particular challenge to Loudon's rebuttal report. In fact, not to reach the merits would result in injustice, as Defendants' arguments and the district court's decision contradict our long-standing precedent about the reliability of expert testimony. *See United States v. Real Prop. Located at 1184 Drycreek Rd.*, 174 F.3d 720, 726 (6th Cir. 1999) (explaining that waiver may be excused when "failure to permit appellate review would work a miscarriage of justice").

The district court excluded Loudon's testimony about the half-inch gap because Loudon had failed to identify an alternate cause—a crack in the pedal mount—for the half-inch gap. Although the district court framed this as an error in Loudon's methodology, the crack in the pedal mount is properly understood as an alternate cause of the half-inch gap. Because, as stated, "[t]he fact that several possible causes might remain uneliminated only goes to the accuracy of the conclusion, not to the soundness of the methodology," the district court abused its discretion in excluding this testimony as unreliable. *Jahn*, 233 F.3d at 390 (citation omitted) (cleaned up).

### b. Kress' Report and Potential Testimony

Plaintiffs also sought to introduce testimony from Dr. Tyler Kress, who holds a Ph.D. from the University of Tennessee and has taught engineering and safety there for almost 30 years. Kress first outlined why he believed that the accident likely occurred because a negative voltage spike in Parks' vehicle led to a sudden unintended acceleration. This negative voltage spike theory is largely consistent with Sero's and Bloch's EMI and cross-talk theory, although it differs slightly. In essence, it describes how an electrical malfunction—in Kress's telling, a negative voltage spike—could lead to unintended cruise control acceleration—under this theory, by sending a command to the electronic throttle control to become wide-open. Kress noted the six recorded

codes from Parks' vehicle indicating an issue with the cruise control system. He also pointed to Loudon's testing on an exemplar vehicle, which showed that the engine speed readings from Parks' car were more consistent with vehicle malfunction. From this, he concluded that it was more likely than not that the accident occurred because of a negative voltage spike.

Apart from this negative voltage spike theory, Kress' report primarily summarized "human factors" evidence that led him to the conclusion that Parks had not misapplied the accelerator pedal. Kress Report, R. 286-1, Page ID #6918. He explained that drivers who mistakenly press the accelerator pedal rather than the brake typically take 1.5 seconds to correct their mistake; however, he noted that because most drivers do not have experience with unexpected acceleration events, a typical driver's reaction time will be slightly longer. He indicated that the distance that Parks' vehicle traveled—over a half of a mile— and the evasive measures that Parks took to avoid hitting anyone indicated that it was not a "mere 'mix-up'" of the brake pedal and the accelerator. *Id.* at Page ID #6928. Further, he noted that before the crash, Parks had been operating her vehicle in a controlled manner and driving down a street with a relatively low speed limit. From these facts, he concluded that there likely would have been no reason for Parks to press the brake or the accelerator with "any significant force." *Id.* at Page ID #6919. Finally, he noted that Parks' children stated that she was a careful driver and that maintenance records show that Parks properly maintained her car before the crash, showing "proper use, handling, care and/or operation" of the car by Parks. *Id.* at Page ID #6931. Kress further opined—similar to Loudon—that the half-inch gap between the accelerator pedal arm and mount after the crash indicated that it was in an idle position. Additionally, he noted that the metrics taken during the post-accident vehicle inspection indicated that the accelerator pedal was in an idle position.

Kress also summarized circumstantial evidence indicating not only that Parks did not misapply the pedal, but that she was pressing the brake at the time of the crash. He concluded that the injuries to Parks' legs after the crash were consistent with her foot being on the brake before the collision. He further cited to extensive eyewitness testimony from individuals who recalled Parks stating at the scene that something was wrong with the car and that she tried to stop but was unable to do so. Based on his opinion that it was more likely than not that Parks was pressing the brake at the time of the accident, Kress opined that the brake override technology—described in the same manner as Loudon–would have prevented the crash.

The district court granted in part and denied in part the motion to exclude Kress' testimony. It permitted Kress to testify to all of his human factors evidence that led him to the conclusion that Parks did not mistakenly accelerate the vehicle on the day of the accident.[11] However, it excluded the remainder of Kress' testimony. First, it found that Kress was unqualified to give any expert testimony about electronics or electrical engineering, and specifically, was not qualified to testify that the accident was caused by a negative voltage spike. This was not an abuse of discretion. "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). As the district court noted, Kress' educational and professional background is in mechanics and biomedical engineering, human factors engineering, and accident reconstruction and causation studies, not electrical engineering.

---

[11] Although the district court did not extensively list what factors Kress could rely on in this testimony, his theories from the report included: (1) Kress' evaluation of Parks' leg injuries indicated that she had not had her foot on the accelerator at the time of the crash; (2) the distance the car traveled was inconsistent with pedal misapplication; and (3) Parks had no reason to brake or accelerate quickly while driving down a street with a low speed limit. Defendants have not challenged the admission of this testimony on appeal.

Moreover, Plaintiffs have pointed to only one portion of Kress' deposition where he explicitly discussed any prior electronics experience, stating: "[A]s an engineer in product safety, [I'm an] individual that's worked extensively in electronics in my profession, and I've had to extensively address electromagnetic noise in my signals over years of research and collecting data." Kress Dep., R. 288-5, Page ID #7463–64. The negative voltage spike theory proffered by Kress is complex, and his limited educational and professional background in electronics did not make him qualified to testify to this theory. *Cf. Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014) (explaining that whether an expert with more electrical engineering background was qualified to testify about equipment that was "not a highly complex . . . electrical system" was a "close[] call").

The district court also excluded Kress' testimony insofar as it discussed Parks' statements just after the crash and Parks' children's statements that Parks was a careful driver. It found that Kress' conclusions from this testimony were not based on Kress' scientific or technical knowledge, but merely summarized testimony that the jury could interpret for itself. The district court, however, explicitly noted that this did not prohibit Kress from identifying the evidence on which he relied or explaining how he evaluated this evidence in reaching his opinions.

The district court did not abuse its discretion in excluding Kress' interpretations of lay witness testimony. The jury is competent to interpret whether Parks' statements that she tried to stop the car was evidence of her braking and whether her history as a safe driver was evidence that she did not mistakenly accelerate on the day of the crash. *See McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1273 (6th Cir. 1988); *see also Youngberg v. McKeough*, 534 F. App'x 471, 479 (6th Cir. 2013). Thus, although Kress may testify that he relied on witness testimony to reach his conclusions, the district court did not err in excluding his interpretations of that testimony.

Finally, the district court found Kress' pedal-position opinions based on the half-inch gap between the pedal arm and base unreliable. First, it found that Kress could not testify to the metrics discovered in the post-crash investigation that showed the accelerator pedal was in the idle position because it required an interpretation of voltage, and Kress could not testify to facts based in electrical engineering. Nevertheless, the district court also noted that it is undisputed that sensors read the accelerator pedal as idle after the crash. The district court also noted that "an expert is not necessary for such an elementary analysis" because "[a]ny juror can visually compare one ½ inch gap to another." Order, R. 340, Page ID #13277. Finally, similar to Loudon's testimony about the half-inch gap, the district court concluded that Kress' methodology was flawed because he did not consider the cracks in the accelerator pedal mount when coming to his conclusion that the half-inch gap indicated an idle position.

The district court erred in excluding this testimony. First, Kress should have been able to testify that he relied on the undisputed record fact that the vehicle metrics produced in the post-crash inspection showed the accelerator pedal in an idle position. Even if Kress was not qualified to testify to his own readings of the metrics and conclusions that they showed the pedal position as idle, he was entitled to rely on undisputed facts in the record to reach his conclusion. *See McLean*, 224 F.3d at 801 ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record."). The district court also erred in concluding that this testimony would not assist the trier of fact. Although a juror could clearly see the half-inch gap, the juror would not know the import of the gap without expert testimony. The district court even conceded this point by stating "[b]eyond an explanation of what a ½ gap indicates in an exemplar, his opinion about the significance of these measurements will not aid the trier of fact." Order, R. 340, Page ID #13277. This is exactly the connection that Kress' proposed testimony would draw,

and it is exactly why it would assist the trier of fact in determining the relevance of the half-inch gap. Finally, for the reasons stated above with respect to Loudon's testimony about the same issue, the district court erred in finding Kress' testimony unreliable because it failed to consider the cracked pedal mount as an alternative cause of the half-inch gap. Because Kress' testimony about the half-inch gap was reliable and would assist the jury, the district court erred in excluding it.

### C. Motion for Summary Judgment

#### 1. Standard of Review

We review a district court's grant of summary judgment *de novo*. *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021). Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56. "When evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the party opposing the motion," and "all reasonable inferences must be made in favor of the non-moving party." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516 (6th Cir. 2019) (citations omitted) (cleaned up). "The moving party bears the burden of showing that no genuine issues of material fact exist," *id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986)), meaning that "no reasonable juror" could find for the non-moving party. *Paterek v. Vill. of Armada, Michigan*, 801 F.3d 630, 646 (6th Cir. 2015).

#### 2. Analysis

The TPLA governs Plaintiffs' claims in this appeal. "[U]nder Tennessee law, establishing a prima facie products-liability claim requires that 'the plaintiff must show: (1) the product was defective and/or unreasonably dangerous, (2) the defect existed at the time the product left the

manufacturer's control,[12] and (3) the plaintiff's injury was proximately caused by the defective product.'" *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citation omitted). "The general rule in Tennessee is that the issue of whether a product is defective or unreasonably dangerous is one for the jury." *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 805 (Tenn. 2001) (citation omitted) (cleaned up).

"[A] plaintiff may demonstrate that a product was defective or unreasonably dangerous through direct evidence, circumstantial evidence, or a combination." *Sigler*, 532 F.3d at 483 (citation omitted). Plaintiffs' circumstantial evidence of a specific defect or an unreasonably dangerous condition, when viewed in the light most favorable to them, is sufficient to establish a genuine dispute of material fact. And because they have also offered sufficient evidence to create a genuine dispute of material fact as to whether this defect or condition caused the accident on the day in question, Plaintiffs should be permitted to present their case at trial.

### a. Evidence of a Specific Defect

Under Tennessee law, a "'[d]efective condition' means a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code § 29-28-102(2). A plaintiff must show proof of a specific defect in a product because "[m]ere proof of an accident, by itself, does not establish that the product is defective." *Tatham v. Bridgestone Americas Holding, Inc.*, 473 S.W.3d 734, 750 (Tenn. 2015). Nevertheless, "[w]here a plaintiff is dependent upon circumstantial evidence [to prove a defect in a product], it is sufficient if he makes out the more probable hypothesis, and the evidence need not arise to that degree of certainty which would exclude every other reasonable conclusion." *Sigler*, 532 F.3d at 486 (second alteration in

---

[12] The parties do not dispute this element of the *prima facie* case, and, therefore, we will not analyze it.

original) (quoting *Motley v. Fluid Power of Memphis, Inc.*, 640 S.W.2d 222, 225 (Tenn. Ct. App. 1982)).

Five pieces of evidence create a genuine dispute of material fact as to whether a specific defect existed in the 2008 Kia Optima. First, Loudon identified that the single signal wire constituted a specific defect. In disregarding this evidence, the district court repeated the errors of the previous summary judgment ruling. The district court held that because Loudon did not explain the fundamental underpinnings of the EMI and cross-talk theory, Loudon's single signal wire theory alone did not constitute evidence of a specific defect. That is, without Sero's and Bloch's EMI theory, the district court claimed that the single signal wire alone did not show how the cruise control could malfunction and cause unintended acceleration. This holding directly violates the remand instructions of the previous panel. Two panel members agreed that Loudon's testimony proffered proof of a specific defect by his theory that the single signal wire constituted a single point of failure. *Kia I*, 2022 WL 557823, at *5; *id.* at *18–19 (Gibbons, J., concurring). In fact, the district court directly cited to *Kia I*'s dissenting opinion to support its holding that Loudon's "design opinions relate to the lack of a failsafe, not a defect that could have been mitigated." Order, R. 340, Page ID #13284. The district court's disagreement with the previous decision does not provide a basis to disregard this Court's holding. The finding that Loudon failed to offer proof of a specific defect was fundamental to the district court's grant of summary judgment to Defendants, and infected the rest of the district court's analysis of Plaintiffs' proof.

Outside of Loudon's report, which describes a specific defect, Plaintiffs have also proffered four pieces of circumstantial evidence that create a genuine dispute of material fact as to whether Parks' vehicle suffered from a specific defect—namely, the single signal wire design of the cruise control system. First, Loudon's testing on an exemplar vehicle showing that Parks' engine speed

was more consistent with cruise control acceleration rather than pedal application is circumstantial evidence that a cruise control defect existed in Parks' car and caused the crash. The district court disregarded this evidence because it found that Loudon's testing itself did not explain how a cruise control malfunction could cause unintended acceleration, but merely showed that Parks' car was traveling at a speed consistent with cruise control acceleration. But circumstantial evidence need not conclusively establish every element of a Plaintiffs' burden. The jury may choose to disbelieve this theory because of what they believe is a lack of connection between the single signal wire and unintended acceleration; however, at this stage, this provides circumstantial evidence that benefits Plaintiffs.

The three remaining pieces of circumstantial evidence created a genuine dispute of material fact as to whether Parks applied the pedal. First, Kress' report indicated that, generally, individuals who misapply the accelerator correct this mistake within 1.5 seconds. Even accounting for factors such as shock or confusion that might have made Parks' reaction time slower, Kress hypothesized that the distance that Parks traveled in the vehicle was inconsistent with pedal misapplication. Second, Kress' report also indicated that the accelerator pedal was in an idle position at the time of the crash, based on the half-inch gap between the pedal arm and mount and the vehicle readings at the time of the post-crash inspection. Although the district court noted that it excluded this testimony as unreliable, for the reasons stated above, that exclusion was an abuse of discretion. Third, testimony of witnesses to the crash, which both recounted their views of Parks' car as it sped down the street and Parks' statements that she tried to stop the car, also provide circumstantial evidence that she did not mistakenly press the accelerator. The district court found that none of these pieces of evidence created a genuine dispute of material fact because they only constituted "circumstantial evidence that driver error did not cause the accident. The elimination of this

possibility leaves any number of remaining possible causes, not a specific defect." Order R. 340, Page ID #13295. But these facts make it more probable that the accident occurred from a vehicle malfunction, meaning they sufficiently create a genuine dispute of material fact. *Sigler*, 532 F.3d at 486. Evidence that shows that the accident did not result from pedal misapplication is probative of a specific defect because, absent driver error, a reasonable juror could make the inference that a specific defect in the vehicle caused the crash.

In summary, because Plaintiffs proffered sufficient proof that the single signal wire constituted a specific defect, that the defect manifested on the day of the crash, and that the crash did not result from driver error, they have created a genuine dispute of material fact as to whether a specific defect existed in the 2008 Kia Optima.

### b. Evidence of an Unreasonably Dangerous Condition

The TPLA also permits recovery if a plaintiff shows that a product was "unreasonably dangerous." *Sigler*, 532 F.3d at 483. Notably, the district court did not discuss whether Plaintiffs could succeed under this theory; instead, it granted summary judgment because it found that Plaintiffs had failed to proffer sufficient proof of a specific defect. But under Tennessee law, Plaintiffs can succeed by showing *either* proof of a specific defect *or* that a product is unreasonably dangerous. Tenn. Code § 29-28-105(a).

Despite the district court's error in conflating the two tests, there may not be much difference in application to this case. A product may be unreasonably dangerous even if it does not contain a defective condition. Instead, a plaintiff may show that the product worked as intended, but that a design flaw made the product unreasonably dangerous. *Cf. Ray by Holman v. BIC Corp.*, 925 S.W.2d 527, 532 (Tenn. 1996) (describing the risk-utility test as relevant to the analysis of whether a product is unreasonably dangerous). Because, in this case, Plaintiffs identify

the single signal wire as both a defect and a design flaw, the tests largely result in the same application. And when proceeding under a theory that a product was unreasonably dangerous, plaintiffs still must point to a particular condition in the product that rendered it unreasonably dangerous because "[m]ere proof of an accident, by itself" is insufficient to establish the first prong of the TPLA *prima facie* case. *Tatham*, 473 S.W.3d at 750; *see also Browder v. Pettigrew*, 541 S.W.2d 402, 404 (Tenn. 1976).

Under the TPLA,

"[u]nreasonably dangerous" means that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

Tenn. Code § 29-28-102(8). Thus, the statute provides two tests to show an unreasonably dangerous condition: the consumer expectation test and the prudent manufacturer test. Both tests are applicable to Plaintiffs' claims. The consumer expectation test is only applicable to "products about which an ordinary consumer would have knowledge." *Ray by Holman*, 925 S.W.2d at 531. Although this test does not apply to complex, commercial machinery such as forklifts or construction equipment, *see, e.g.*, *Brown v. Raymond Corp.*, 432 F.3d 640, 647 (6th Cir. 2005); *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007), it does apply to components of passenger vehicles that drivers regularly use, such as cruise control. *See, e.g.*, *Sigler*, 532 F.3d at 485 (airbags); *Tatham*, 473 S.W.3d at 751 (tires); *Jackson*, 60 S.W.3d at 804 (seatbelts).

Plaintiffs have created a genuine dispute of material fact as to whether the 2008 Kia Optima was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it." Tenn. Code § 29-28-102(8). The statements made by witnesses to the accident

and Parks herself establish that a consumer would have expected that the car would not suddenly accelerate unintentionally. The circumstantial evidence that shows Parks' vehicle was likely accelerating through cruise control and the evidence that cuts against Defendants' theory of pedal misapplication and supports a theory of vehicle malfunction—all described above when discussing a specific defect—similarly supports finding that the vehicle was unreasonably dangerous in a manner that would not be contemplated by the ordinary consumer.

Under the prudent-manufacturer test, the car was also unreasonably dangerous. This test inquires whether a prudent manufacturer, assumed to have knowledge of a potentially dangerous condition, would have produced and marketed a product. *Ray*, 925 S.W.2d at 531. There is a dispute of material fact as to whether a prudent manufacturer would have marketed the 2008 Kia Optima. First, Loudon contends that the design of a single signal wire created an unacceptable level of risk, and that Kia would have known about this risk had they conducted a FMEA on the engine management system. Second, Loudon contends that a brake override system would have prevented this accident because it could have stopped the unintended wide-open throttle that caused the acceleration. Kia's corporate designee testified that it would have been feasible to retroactively implement this brake override system in the Kia Optima. Both of these facts create a genuine dispute as to whether a prudent manufacturer would have viewed the vehicle as having an unreasonably dangerous condition and would have put this car on the market.

For all the above reasons, the district court erred in granting summary judgment to Defendants on the theory that Plaintiffs had not proven either a specific defect or an unreasonably dangerous condition.

### c. Proximate Cause

The TPLA's prima facie case also requires a plaintiff to show that "the plaintiff's injury was proximately caused by the defective product." *Sigler*, 532 F.3d at 483 (citation omitted). The district court found that Plaintiffs had failed to present a genuine dispute of material fact showing that a specific malfunction in the cruise control system caused the accident. It stated that "Plaintiffs theory of causation is based on the excluded EMI testimony of Sero and Bloch. Without it, they do not have a complete – much less more probable – causation hypothesis." Order, R. 340, Page ID #13296. It found that Loudon had not proffered a theory of a specific defect that caused the car to accelerate because he had not established a concrete theory as to how the single signal wire could have caused unintended acceleration through a malfunction in the cruise control system. Instead, the district court found that Plaintiffs' causation theory was dependent on Sero's and Bloch's excluded testimony.

Contrary to the district court's reasoning, Plaintiffs have sufficiently produced evidence that a malfunction in the car, spurred by the single signal wire defect, caused the accident. First, Loudon contended that the cruise control system could receive an unintended input to accelerate, and that this could be caused by an errant signal running through the single signal wire design. To be sure, his theory of unintended acceleration was not as detailed as Sero's and Bloch's EMI theory, but he nevertheless contended that unintended cruise control acceleration was possible. He further concluded that the accident was much more likely caused by a cruise control malfunction from an errant signal running through the single wire governing the input to the cruise control. He based this opinion on the six previous error codes in the vehicle that indicated an error in the cruise control system and his testing on an exemplar vehicle. This creates a genuine dispute of material fact as to what caused the accident.

Plaintiffs' other circumstantial evidence discrediting Defendants' theory of pedal misapplication bolsters this conclusion. Specifically, the half-inch gap between the pedal arm and mount, indicating that the pedal was in the idle position at the time of the crash, Kress' testimony about the average time for a driver to correct a pedal misapplication, and eyewitness testimony indicating that Parks attempted to stop the vehicle all create a genuine dispute of material fact as to whether Parks was pressing the accelerator at the time of the accident. Additionally, Plaintiffs have presented evidence to rebut Defendants' argument that Parks did not press the brakes before the accident. Kress found that the injuries to Parks' legs were consistent with her foot being on the brake at the time of the accident. And Loudon showed that, with a wide-open throttle, it is likely that Parks would have been unable to stop the car even if she applied the brakes because the car lacked a brake override system.

Ultimately, the district court on remand found causation lacking for almost the same reasons as the district court did when ruling on summary judgment the first time. It found that Plaintiffs' theory of how the car malfunctioned on the day of the accident could not be proven without Sero's and Bloch's testimony because only their testimony proffered a theory as to how a cruise control malfunction could cause unintended acceleration. But for the reasons stated above, Plaintiffs have established a genuine dispute of material fact as to whether cruise control malfunction caused the accident. As such, the district court erred in granting summary judgment to Defendants on the basis of causation.

### d. Negligence

The district court did not consider whether Defendants negligently manufactured the 2008 Kia Optima because it found that Plaintiffs had failed to state a claim under the *prima facie* case applicable to all TPLA claims. On appeal, the parties have not presented specific arguments as to

Plaintiffs' negligence claims either. Having satisfied the *prima facie* case, to succeed on a theory of negligence, "the plaintiff has the additional burden of proving that the defective condition of the product was the result of negligence in the manufacturing process or that the manufacturer or seller knew or should have known of the defective condition." *Browder*, 541 S.W.2d at 404.

Plaintiffs' negligence arguments largely rise and fall with their prudent manufacturer arguments. Specifically, the following three issues could lead a rational trier of fact to conclude that Defendants were negligent in their design and construction of the 2008 Kia Optima: (1) the lack of a brake override system, even though one could have been retroactively implemented; (2) the failure to conduct a system-wide FMEA on the engine management system; and (3) the negligent design of a single signal wire to control the entire cruise control system.

In sum, Plaintiffs have put forth sufficient evidence to meet the TPLA's *prima facie* case and have created a genuine dispute of material fact as to whether Defendants were negligent in manufacturing the 2008 Kia Optima. Because Plaintiffs have met their burden to overcome summary judgment, they should be permitted to proceed to a jury on all claims.

## D. Judicial Reassignment

Plaintiffs request that this case be moved to a new judge in an entirely different venue, or, alternatively, a new district court and magistrate judge within the same district.[13] "In evaluating a request for reassignment on remand, we look at three factors: '(1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously

---

[13] As stated, on remand, a different district judge heard this case because the previous district court judge retired between the first summary judgment ruling and the disposition of the first appeal. Thus, Plaintiffs' request to move the case to an entirely new venue stems from the fact that two judges within the same district have separately granted summary judgment for Defendants. Ultimately, however, Plaintiffs' request boils down to a request for judicial reassignment.

expressed views or findings; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.'" *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 580 (6th Cir. 2013) (quoting *Solomon v. United States*, 467 F.3d 928, 935 (6th Cir. 2006)).

None of these factors support reassignment. Plaintiffs describe the actions of the district court on remand as "egregious[]" and claim that "[i]t is apparent that the district court does not want Plaintiffs to have a jury trial in this case." Parks Pl's Br., ECF No. 22, 52. While the district court erred in evaluating the evidence set forth by Plaintiffs, this alone is insufficient to warrant judicial reassignment. *Johns v. Holder*, 678 F.3d 404, 408 (6th Cir. 2012) ("The judge's treatment of the evidence alone cannot support a claim of bias."). And Plaintiffs have not pointed to any specific remarks by the district court that "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Without more, Plaintiffs have not shown that the district court would be unable to put aside its previous findings or that reassignment would be necessary to "preserve the appearance of justice." *Villegas*, 709 F.3d at 580 (citation omitted). Further, "the nature of this complex litigation with multiple experts and significant time spent in discovery resolves the third factor, that of judicial economy, against reassignment." *Id.* "Reassignments should be made infrequently and with the greatest reluctance." *Solomon*, 467 F.3d at 935 (cleaned up). For the foregoing reasons, judicial reassignment is unwarranted in this case.

### III.   CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's grant of the motion to exclude Loudon's testimony. We **AFFIRM** in part and **REVERSE** in part the district court's grant of the motion to exclude Kress' testimony. Kress should be permitted to testify to all of his

opinions except those discussing electrical issues and the testimony of lay witnesses. We **REVERSE** the district court's grant of summary judgment to Defendants, and **REMAND** the case for proceedings consistent with this opinion.

JOHN K. BUSH, Circuit Judge, dissenting. I need not belabor my position from the first time we heard this appeal: plaintiffs have failed to produce any admissible evidence to meet their burden of showing that a specific defect caused the crash, as Tennessee law requires. *King v. Danek Med., Inc.*, 37 S.W.3d 429, 435 (Tenn. Ct. App. 2000); *Benson v. Tenn. Valley Elec. Co-op.*, 868 S.W.2d 630, 636 (Tenn. Ct. App. 1993). In the prior appeal of this case, the majority of the panel reversed the district court's grant of summary judgment to defendants, concluding that Loudon and Kress's testimony, unsupported by other experts, *might* identify a specific defect. *Hill v. Kia Motors Am., Inc.*, No. 20-5690, 2022 WL 557823, at *5 (6th Cir. Feb. 24, 2022); *id.* at *19 (Gibbons, J., concurring in the judgment). But, on remand, a new district judge assigned to this case also determined that plaintiffs could not prevail: the district court excluded most of Loudon and Kress's testimony and granted defendants' motion for summary judgment because plaintiffs presented no "evidence of a specific defect in the subject vehicle that caused their damages." Mem. Op. & Order, R. 340, PageID 13236.

In its fresh look at the case, the district court did not abuse its discretion in excluding most of Loudon and Kress's testimony. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 430 (6th Cir. 2007) (explaining that the reviewing court must "be highly deferential" to the district court's analysis of whether to admit expert testimony). A couple of examples for which the majority opinion reverses the district court's exclusion suffice here. The district court excluded as unreliable "Loudon's opinion that an errant signal from the cruise control system in Ms. Parks's vehicle caused unintended acceleration on the day of the crash." Mem. Op. & Order, R. 340, PageID 13250; *see* Loudon Report, R. 288-1, PageID 7030 ("[I]t is clear that this accident was much more likely caused by the cruise control system engaging the resume/accel function and accelerating continuously until the vehicle struck another vehicle."). Loudon did not sufficiently

test this hypothesis: he did not test the cruise control system on Parks's Optima (or even ever inspect that car) or test the exemplar Optima for this specific defect by inducing a failure in its cruise control system. Instead, he compared characteristics between cruise control-induced acceleration and accelerator pedal-induced acceleration on the exemplar. Loudon Dep., R. 288-2, PageID 7072, 7203, 7222; Loudon Report, R. 288-1, PageID 7025–30. Given these flaws, the district court did not abuse its discretion in excluding this opinion. *See Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) ("Red flags that caution against certifying an expert include . . . improper extrapolation, failure to consider other possible causes, [and] lack of testing[.]").

The district court also excluded as unhelpful and unreliable Kress's opinion, based on voltage readings and his assessment of a gap difference between the accelerator pedal assembly in Parks's Optima and the exemplar Optima, that it was "more likely than not that the subject accident was caused by a fault from a sudden acceleration of the vehicle that the driver does not intend." Kress Report, R. 286-1, PageID 6925; s*ee* Kress Dep., R. 294-11, PageID 10684; Mem. Op. & Order, R. 340, PageID 13275–77. As acknowledged by the majority opinion, Kress is not qualified to offer opinions on electronics or electrical engineering, Maj. Op. at 27, so he lacks qualifications to interpret voltage readings.[1] *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) ("The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.").

---

[1] The majority opinion first points out that it is undisputed that electronic vehicle metrics after the crash registered the accelerator pedal as in an idle position, then argues that Kress—even though he lacks qualifications to opine on electronics—can rely on that undisputed fact to reach his opinion. Maj. Op. at 28. But Kress is unqualified to make *any* electronic opinion, even one premised on undisputed facts. Moreover, Kress's testimony is unnecessary to put undisputed facts in the record. Thus, the majority opinion makes a distinction without a difference as to the admission of Kress's testimony.

Kress's measurement of the ½ inch gap between the pedal and the base in both the undamaged exemplar accelerator pedal assembly and the damaged Parks's Optima assembly does not help the jury, which can measure the gap itself. *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1273 (6th Cir. 1988) (explaining that expert testimony "address[ing] matters that [are] equally within the competence of the jurors to understand and decide" are "not helpful to the jury"). As to the significance of these measurements, Kress did not consider alternative explanations for the presence of the gap on the exemplar and Parks Optima assemblies, such as the crash rotating and cracking the pedal assembly. *See Newell Rubbermaid, Inc.*, 676 F.3d at 527. Because Kress's opinions were unhelpful and unreliable, the district court did not abuse its discretion in excluding this testimony.

We should also affirm the district court's grant of summary judgment to defendants. Plaintiffs must show that a specific defect caused the crash to prevail on their claims.[2] The majority opinion identifies one piece of direct evidence and four pieces of circumstantial evidence supporting the same defect: "the single signal wire design of the cruise control system." Maj. Op. at 31. But the majority opinion mischaracterizes the evidence, none of which saves plaintiffs from summary judgment.

To begin, the majority opinion contends that the district court ignored a holding from the prior panel that Loudon's testimony showed evidence of a specific defect. *Id.* at 32. But the earlier holding of the panel, as limited by the concurrence, did not conclusively determine that Loudon

---

[2] Plaintiffs may also proceed by showing that a product was unreasonably dangerous. *See* Tenn. Code Ann. § 29-28-105(a); *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). But, as the majority opinion notes, "there may not be much difference in application to this case" between the specific defect and unreasonably dangerous bases because plaintiffs "identify the single signal wire as both a defect and a design flaw." Maj. Op. at 33–34. Thus, I discuss the specific defect basis, recognizing that the same weaknesses plague both bases.

offered evidence of a specific defect; rather "[b]ecause plaintiffs did argue that Loudon's testimony established a specific defect (the use of a single wire) and causation, the district court abused its discretion in denying as moot defendants' motions to exclude Loudon and Kress." *Hill*, 2022 WL 557823, at *19 (Gibbons, J., concurring in the judgment). And "[a]fter considering the admissibility of Loudon's and Kress's testimony, it is the district court's role to determine whether to grant summary judgment." *Id.* After all, if the panel affirmatively held that Loudon offered direct evidence of a specific defect, and that the defect caused the crash, remand for reconsideration of the motion for summary judgment would be unnecessary. As a matter of law, plaintiffs would have sufficiently met their burden to survive defendants' summary judgment motion.

With this panel's limited instructions, as defined by comparing the lead and concurring opinions, the district court reevaluated Loudon's opinions untethered from Sero's and Bloch's, and correctly concluded that they did not provide direct evidence of a specific defect. As I explained before, Loudon's "'single wire' theory [was] contingent on" Sero's excluded testimony, and plaintiffs "pitched" this theory "as the 'lack of a failsafe' rather than the underlying defect that would have been required to generate an erroneous 'on' signal sent across the wire." *Id.* at *32 n.14 (Bush, J., dissenting); *see* Loudon Report, R. 288-1, PageID 7020–21 ("If Kia had designed its cruise control switch with redundant signals, more robust and timely diagnostics could have been developed that would have *mitigated failures* which result in unintended acceleration like the accident that occurred with Mrs. Park's [sic] 2008 Kia Optima" (emphasis added)). So, as the district court held, Loudon's "design opinions relate to the lack of a failsafe, not a defect that could have been mitigated by a failsafe." Mem. Op. & Order, R. 340, PageID 13284. Plaintiffs' single wire theory, using evidence proffered by Loudon, thus fails to identify a specific defect causing the crash, as the district court properly found. *See id.*

Turning to circumstantial evidence deemed significant by the majority, Loudon tested the exemplar vehicle and concluded that the tachometer and speedometer readings on the dashboard of Parks's Optima suggested that the "cruise control system engaging the resume/accel function and accelerating continuously until the vehicle struck another vehicle" was the "much more likely" cause of the accident than pedal misapplication. Loudon Report, R. 288-1, PageID 7030. As already discussed, the district court rightly excluded this opinion. But even if the court had admitted the testimony, Loudon fails to point to a specific defect within the cruise control system that could cause unintended acceleration. Instead, Loudon just compares engine signatures and supposes that cruise control system failure more likely explained the crash than pedal misapplication.

Rather than point to a specific defect, Loudon testified that he relied on "other experts" (i.e, Sero and Bloch) to explain how the cruise control malfunctioned. Loudon Dep., R. 288-2, PageID 7200–01. Loudon's engine signature comparison alone thus does not provide circumstantial evidence that unintended cruise control-induced acceleration caused Parks's accident. The other three pieces of circumstantial evidence proffered by the majority opinion— Kress's report about the amount of time pedal misapplication typically takes to correct, his report that the accelerator pedal was in the idle position, and testimony from witnesses who saw the crash and heard Parks's statement—all suffer from the same deficiency: they attempt to eliminate alternatives to the pedal misapplication theory but fail to identify a specific defect that caused the crash. *See* Maj. Op. at 32–33. In sum, none of the evidence relied upon by the majority opinion to reverse the district court's grant of summary judgment to defendants favors that position.

In an exhaustive decision, the district court provided clear reasons to exclude most of Loudon and Kress's testimony and grant summary judgment to defendants. Plaintiffs offer no

persuasive reason to disturb the judgment. At bottom, plaintiffs have not shown that a specific

defect cause the crash, as is their burden under Tennessee law. Evidence, not tragedy, must supply

the basis for plaintiffs' claims. I therefore respectfully dissent.